[No. A119046. First Dist., Div. Two. Nov. 14, 2008.]

ALEXIS GIRALDO, Plaintiff and Appellant, v.
DEPARTMENT OF CORRECTIONS AND REHABILITATION et al.,
Defendants and Respondents.

234

COUNSEL

The Walston Legal Group, Gregory S. Walston and Julie Zhalkovsky for Plaintiff and Appellant.

Melissa Rothstein and Serena Lin for Stop Prisoner Rape as Amicus Curiae on behalf of Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, David S. Chaney and Frances T. Grunder, Chief Assistant Attorneys General, Jonathan L. Wolff, Jose A. Zelidon-Zepeda and Emily Brinkman, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**RICHMAN, J.**—Plaintiff's appeal presents two questions never before decided in California: (1) whether the relationship between jailer and prisoner is a special relationship giving rise to a duty of care to the prisoner; and (2) whether there is a private right of action for damages for violation of the cruel or unusual punishment clause of the state Constitution, article I, section 17. We answer yes to the first question, no to the second.

Plaintiff Alexis Giraldo, describing herself as a male-to-female transgender person, was an inmate in the California prison system. Plaintiff filed an action against California's Department of Corrections and Rehabilitation (CDCR) and various CDCR personnel (when referred to collectively, defendants) "challeng[ing] prison policies that place transgender inmates, such as [plaintiff], who have the physical appearance of women, in the male inmate population without any meaningful precaution to the obvious risk of sexual assault to them." The complaint made the specific claim that defendants failed to take action on plaintiff's repeated complaints that she was being beaten and raped by her cellmate at Folsom State Prison.

Plaintiff's complaint alleged three causes of action: (1) negligence; (2) intentional infliction of emotional distress; and (3) violation of the cruel or unusual punishment clause of the California Constitution. The law and motion judge sustained a demurrer to the first cause of action based on a failure to allege a cognizable duty. The second cause of action was rejected by a jury. And the trial judge dismissed the third cause of action on motion by defendants.

We hold that the trial court erred in sustaining the demurrer to plaintiff's negligence claim based on a lack of duty, and thus reverse the ruling as to the first cause of action. We also hold that the trial court properly dismissed plaintiff's claim for damages based on an alleged violation of the cruel or unusual punishment clause, and that the trial court did not err in dismissing plaintiff's claims for declaratory and injunctive relief, as the conclusion that these claims became moot upon plaintiff's parole from prison was supported by substantial evidence. We thus affirm the dismissal of the third cause of action and plaintiff's equitable claims.

## I. BACKGROUND

A. *The Facts*

As noted, plaintiff's first claim for negligence was addressed via demurrer, which was sustained by the law and motion department. The relevant facts,

therefore, are those contained in plaintiff's complaint, and we begin with the standard of review applicable here, well described in *City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 869–870 [13 Cal.Rptr.3d 420]: "It is well established that a demurrer tests the legal sufficiency of the complaint. [Citations.] On appeal from a dismissal entered after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the [complaint] states a cause of action as a matter of law. [Citations.] We give the [complaint] a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts that were properly pled. [Citation.] We must also accept as true those facts that may be implied or inferred from those expressly alleged. [Citation.] We may also consider matters that may be judicially noticed, but do not accept contentions, deductions or conclusions of fact or law. [Citation.]" (Accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

The operative complaint is the amended complaint. It is 34 pages long, with 175 paragraphs, and contains extensive details of horrific sexual abuse plaintiff allegedly suffered at the hands of her cellmate, abuse that, according to plaintiff, defendants were repeatedly told about and repeatedly disregarded. Those details are not necessary to our analysis here, and we set forth the essential facts alleged in the amended complaint, which are these:

On or about October 17, 2005, plaintiff was incarcerated at North Kern State Prison on a parole violation. Plaintiff was a male-to-female transgender inmate who "has the physical appearance of a woman, yet she [was] incarcerated with male inmates without any meaningful precaution to the obvious risk of sexual assault stemming from being unprotected from the countless male inmates she is housed with."

In December 2005, plaintiff was classified as a level III inmate with 36 points, which resulted in her having a primary placement recommendation for incarceration at either California Medical Facility (CMF) or California Men's Colony (CMC). CMF and CMC have higher concentrations of transgender inmates, and such inmates are relatively safer at both prisons than at other state prisons.

Contrary to that recommendation, however, plaintiff was in fact assigned to Folsom State Prison (FSP), to which she was transferred on January 4, 2006. Within a week of her assignment to FSP, an inmate employed as a lieutenant's clerk requested that plaintiff be assigned as his cellmate, which request

was granted. Beginning almost immediately, and lasting through late January, the cellmate "sexually harassed, assaulted, raped and threatened" plaintiff on a daily basis.

During the time plaintiff was housed in this cell, her cellmate introduced her to his friend, another inmate, who in late January requested that plaintiff be transferred to his cell, which request was also granted. One to two weeks after plaintiff moved into this cell, her new cellmate began raping and beating her, again daily. Plaintiff reported the abuse to prison staff members, apparently on numerous occasions, repeatedly requesting transfer to a different cell. Her reports were ignored, and she was always returned to the same cell.[1] After one final incident on March 12, 2006, in which her cellmate raped her and attacked her with a box-cutter, plaintiff was finally placed in segregated housing.

As a result of these incidents, plaintiff suffered, and continued to suffer, "severe emotional distress that has caused severe depression and anxiety." Plaintiff was, at the time she filed her complaint, housed in a unit for psychologically troubled inmates at CMF and expressed her fear that she would "be released from the mental-health unit and into the general male-inmate population, which [would] significantly increase the risk that she [would] be sexually assaulted once again." Plaintiff also alleged that "[u]pon her release from custody, her transition to civilian life will be more difficult, which decreases her chances of successful rehabilitation. She will need to seek professional mental-health care for the rest of her life, and her ability to work and earn income will also be diminished for the rest of her life."

B. *The Pretrial Proceedings*

Plaintiff's first cause of action was for negligence, and alleged in fundamental part that "Defendants' custody of plaintiff created a situation of

---

[1] Our disclaimer about detail notwithstanding, two specific allegations about this timeframe are illustrative. First, plaintiff alleged that on March 8, 2006, she was able to get to the office of correctional counselor Jerry Ignasiak, and told him that "her cellmate had become violent, was forcing her to have unwanted sex with him on a daily basis, would beat her if she refused to have sex with him, and was physically abusing her." In fear for her life, plaintiff pleaded with Ignasiak to move her from the cell, showing him her CMF and CMC classification recommendations, and explaining that she was never supposed to be placed at FSP. Ignasiak told plaintiff to be "tough and strong," did nothing else, and "even discouraged [plaintiff] from taking any further action." He then returned her to her cell.

Second, on March 10, 2006, plaintiff sought protection by speaking to Amy Holliday, an FSP medical employee, telling her that her cellmate was raping and beating her daily. Holliday wrote the following entry in plaintiff's chronological interdisciplinary progress notes: "Inmate has been dealing with an abusive cellie [cellmate] who has become sexually demanding and overly possessive. I/M [inmate] would like transfer to transgendered [*sic*] unit but doesn't want to 'lock it up.' 'I don't want to get him into trouble.' "

dependency, which resulted in detrimental reliance on them for protection. This, in turn, established a duty of care to protect [plaintiff] under *Williams v. State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] and other applicable law discussing the doctrine of the 'special relationship.' " The second cause of action was for intentional infliction of emotional distress, and alleged that plaintiff had on multiple occasions informed various prison staff members that her cellmate was raping and beating her, yet they continued to place her back in the same cell with the knowledge that she would continue to be assaulted. The third cause of action was for violation of the California Constitution, article I, section 17, and alleged that defendants acted with "deliberate indifference" to plaintiff's safety needs, and that defendants' conduct was "shocking to the conscience" in violation of the cruel or unusual punishment clause of the California Constitution. (Cal. Const., art. I, § 17.)

The first and third causes of action named 13 defendants, CDCR and 12 individuals: Correctional Officer Christopher Brozdounoff; Psychologist Louis Flohr; medical technical assistant Frederick Potts; medical technical assistant Michael Ballard; Ignasiak; Psychologist Francis Gyorkey; Holliday; Correctional Sergeant Darrel Ayers; Correctional Officer Mark Stites; FSP Warden Matthew C. Kramer; former CDCR Secretary Jeanne S. Woodford; and CDCR Secretary James E. Tilton. Brozdounoff, Flohr, Potts, Ballard, Ignasiak, Gyorkey, Holliday, Ayers, and Stites were also named in the second cause of action for infliction of emotional distress. As to all defendants except Tilton and CDCR, plaintiff alleged they were not acting within their discretion within the meaning of Government Code section 820.2, because they "were performing the non-discretionary, ministerial function of implementing state policies governing the classification and housing of inmates. . . ." There were no such allegations as to Tilton and CDCR.

Plaintiff's prayer sought general and special damages, punitive damages, a permanent injunction prohibiting Tilton and CDCR from violating the rights of transgender inmates, and a declaratory judgment that (1) the practice of housing transgender inmates with male inmates violates the prohibition against cruel or unusual punishment, and (2) prison officials owe a duty to protect inmates under the "special relationship" doctrine of tort law. Plaintiff also sought costs of suit and attorneys' fees.

Contemporaneous with the filing of her original complaint, plaintiff filed a motion for trial preference pursuant to Code of Civil Procedure section 36, subdivision (e), seeking a trial date within 90 days of the hearing on the motion. Plaintiff asserted that the equitable portions of her claims would arguably become moot upon her parole (then set to occur in August), and that the interests of justice would be served by a trial date prior to her parole.

Over defendants' opposition, on April 18, 2007, the trial court granted the motion, setting a jury trial for July 2, 2007.

On May 31, 2007, defendants filed a joint demurrer to plaintiff's amended complaint, asserting nine separate arguments: (1) plaintiff failed to state facts constituting a cause of action against FSP; (2) plaintiff failed to timely file a claim under the Tort Claims Act as to Brozdounoff and Flohr; (3) plaintiff failed to exhaust her administrative remedies as to CDCR, FSP, Woodford, Tilton, Kramer, Flohr, Ballard, Gyorkey, and Ayers; (4) CDCR was immune from liability; (5) plaintiff failed to state facts constituting a cause of action for negligence against CDCR and Tilton; (6) all defendants were immune for their discretionary acts which allegedly caused plaintiff's injuries; (7) plaintiff failed to state facts constituting a cause of action for negligence; (8) plaintiff failed to state a claim for infliction of emotional distress; and (9) plaintiff failed to state a claim for violation of the California Constitution.[2]

As to the seventh ground, failure to state a claim for negligence, defendants argued, without citation to authority, that "the 'special relationship' doctrine is inapplicable in the context of prisoners," simply pointing out that plaintiff "provides no caselaw support for her claim that defendants owe her a duty of care as a result of a 'special relationship.' " Alternatively, defendants argued that they were not liable to plaintiff for the injuries caused by a third party because their conduct was not a "substantial factor" in bringing about plaintiff's injuries.

As to the claim for violation of the constitutional prohibition against the infliction of cruel or unusual punishment, defendants argued that plaintiff alleged a "deliberately indifferent" standard, which according to defendants failed to state a claim under the California Constitution because the "deliberate indifference" test is "purely a creature of federal law."

On June 5, 2007, plaintiff filed opposition to the demurrer. As is relevant here, plaintiff argued that the demurrer to the negligence claim should be overruled "because the complaint alleges the prima facie elements of negligence." According to plaintiff, the amended complaint alleged that defendants owed plaintiff a duty, they breached it, and their breach proximately and actually caused plaintiff harm. And, she argued, the very nature of the prison environment—in which plaintiff was forced to rely on defendants for protection—was a "special relationship," which established a duty on the prison employees to protect her. Plaintiff again cited *Williams v. State of California,*

---

[2] Defendants also filed a motion to strike. That motion, which was granted in part by the trial court, is not relevant to the issues on appeal.

*supra,* 34 Cal.3d 18 (*Williams*), but acknowledged that no California court had found a "special relationship" duty in the prison context, further observing that no court had rejected it either.

As to the cruel or unusual punishment claim, plaintiff explained that because "[n]o court has clearly defined the standard for a violation of the California Constitution's cruel-or-unusual-punishment clause," she was "asking the Court to define the standard of review for such claims," and to do so using the federal "deliberate indifference" standard. Plaintiff closed her opposition by "disavow[ing] her right to amend" in the event the court found any of her claims "incognizable or improperly pled," so that she could proceed on the remaining claims lest any equitable claims become moot by her impending parole.[3]

On June 15, 2007, the law and motion department heard brief argument on the demurrer, following which it stated its rulings. As to the negligence claim, the court said, "I'm inclined to sustain the demurrer to the negligence claims as to all defendants. I don't think that—it's premised on there being a special relationship. I don't think the law of California creates such a relationship or therefore a duty under these circumstances. To the extent the law speaks of it, I think it goes the other way in fact, that there isn't such a special duty."

As to the cruel or unusual punishment claim, the court ruled otherwise: "I'm inclined to overrule the demurrer with respect to the constitutional claim as to the remaining defendants. I don't think that it is fatal to the claim that it uses language from federal law, even if ultimately the State were to adopt a different standard. I think it alleges facts which could state a claim for cruel and unusual punishment, and that that's enough at this stage, whatever ultimately the law is that shakes out in the application of it to these facts."

That same day, the court entered the following order: "The demurrer is sustained as to Folsom State Prison,[4] Brozdounoff and Flohr as to all claims. The demurrer is sustained as to plaintiff's negligence claims against all defendants for failure to plead cognizable duty. The demurrer is sustained as to Kramer and Woodford because their acts were discretionary. The demurrer is sustained as to Tilton in his individual capacity because his acts were discretionary. The demurrer is otherwise overruled." The remaining defendants were ordered to answer the amended complaint, and the matter proceed to trial.

---

[3] Defendants apparently filed a reply memorandum, but it is not in the record before us.

[4] FSP was not named as a defendant in the amended complaint. Plaintiff did allege, however, that FSP was liable for punitive damages. In her opposition to defendants' demurrer, plaintiff acknowledged that the inclusion of FSP in the request for punitive damages was an error and that she did not oppose the dismissal of FSP from the action with prejudice.

In light of the court's ruling on the demurrer, the following claims remained: (1) plaintiff's claim for infliction of emotional distress against Potts, Ballard, Gyorkey, Ignasiak, Holliday, Ayers, and Stites; and (2) her claim for violation of the cruel or unusual punishment clause against CDCR, Potts, Ballard, Gyorkey, Ignasiak, Holliday, Ayers, and Stites. While it is somewhat ambiguous from the record, it appears that the court intended to dismiss the negligence and cruel or unusual punishment claims against Tilton, but for him to remain in the case in his official capacity because plaintiff's request for injunctive and declaratory relief against Tilton and CDCR survived the demurrer.

On July 9, 2007, defendants filed a notice of removal to federal court. The case was remanded that same day, but upon remand the jury trial (which had already been continued from July 2 to July 9) was again continued, to July 16, 2007.

On July 13, 2007, plaintiff was released from prison on parole. That same day, defendants filed a motion to dismiss plaintiff's prayer for declaratory and injunctive relief, arguing that her claims for equitable relief were moot due to her release from CDCR custody and that her claims did not fall under the "general public interest" exception to the mootness doctrine. Additionally, defendants sought dismissal of plaintiff's claim for damages under the California Constitution, arguing that article I, section 17 does not support a private right of action for tort damages.

## C. The Trial Proceedings

On July 16, 2007, trial began, which would include presentation of evidence until July 30. Meanwhile, on July 23, defendants filed a supplemental brief in support of their motion to dismiss plaintiff's claim for declaratory and injunctive relief. The brief was filed at the request of the court, which had sought supplemental briefing on the issue of what impact plaintiff's parole.had on her custody status with CDCR and the mootness issue. In their supplemental brief, defendants argued that plaintiff's "constructive custody" status did not affect the analysis and that the claims for equitable relief were in fact moot.

On July 30, 2007, following the conclusion of testimony, the court addressed defendants' motion to dismiss. As to defendants' argument that there is no private right of action for damages for violation of California's cruel or unusual punishment clause, the court agreed: "It was the intent of the court not to allow the plaintiff to request damages for this constitutional violation, because there was no case law authorizing it." The court also agreed with defendants' argument that plaintiff's equitable claims were moot

in light of her parole. Consequently, the only issue submitted to the jury was plaintiff's claim for intentional infliction of emotional distress against Potts, Ballard, Ignasiak, Gyorkey, Holliday, Ayers, and Stites.

On August 2, 2007, the jury returned a defense verdict as to six of the defendants and deadlocked on one.[5] That verdict is not an issue on appeal.

On August 7, 2007, plaintiff filed a request for dismissal with prejudice of her complaint. In an accompanying notice of voluntary dismissal, plaintiff explained that the "voluntary dismissal [was] made in order to facilitate an appeal of the Court's adverse ruling of June 15, 2007 dismissing her negligence claims as well as the Court's adverse ruling of July 30, 2007 dismissing her claims under Article I, section 17 of the California Constitution. *Stewart v. Colonial Western Agency, Inc.* (2001) 87 Cal.App.4th 1006, 1012 [105 Cal.Rptr.2d 115]."

That same day, plaintiff filed a notice of appeal.

## II. DISCUSSION

### A. *Jurisdiction*

We briefly address defendants' first argument, premised on Code of Civil Procedure sections 904.1 and 581, that we lack jurisdiction to consider this appeal because neither plaintiff's voluntary dismissal nor the subsequent dismissal entered by the clerk is an appealable order. Defendants previously filed a motion to dismiss this appeal on the same ground, which we denied. While that prior order does not preclude us from revisiting this issue (*Kowis v. Howard* (1992) 3 Cal.4th 888, 900 [12 Cal.Rptr.2d 728, 838 P.2d 250]), we adhere to our prior determination that defendants' argument is misplaced. (*Stewart v. Colonial Western Agency, Inc., supra*, 87 Cal.App.4th 1006, 1012.) We therefore turn to the merits of plaintiff's claims, beginning with her challenge to the trial court's ruling on the demurrer to her negligence claim, which demurrer was sustained for "failure to plead cognizable duty."

### B. *The General Principles*

■ In *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243 [80 Cal.Rptr.2d 196] (*Adams*), we began our analysis with an exposition of the principles pertinent to the question of duty as it pertains to public employees,

---

[5] The name of that one defendant is not in the record. Likewise not in the record is any evidence supporting plaintiff's assertion that a "majority of jurors favor[ed] a plaintiff's verdict" on the remaining defendant.

first setting forth the fundamental rule that the right to recover against public entities or their employees for injuries resulting from alleged negligent conduct has, since 1963, been defined by statute. We then went on: "Public employees are liable for injuries resulting from their acts or omissions to the same extent as private persons, except where otherwise exempted or immunized by law. ([Gov. Code,] § 820.) Public entities are correspondingly liable for the negligent acts or omissions of their employees acting within the scope of their employment except where either the employee or the public entity is immunized from liability by statute. ([Gov. Code,] § 815.2.) However, '[t]he exclusive sway of statutory rules does not foreclose the aid of common law tort doctrines and analogies in ascertaining and achieving imperfectly expressed statutory objectives. [Citation.]' [Citation.] Where a legal duty is not created by statute, the question of whether a legal duty exists is analyzed under general principles of tort law. [Citation.] [¶] ' "A tort, . . . involves a violation of a legal duty . . . owed by the defendant to the person injured. Without such a duty, any injury is 'damnum absque injuria'—injury without wrong. [Citations.]" [Citation.]' " (*Adams, supra,* 68 Cal.App.4th at p. 264; fn. omitted.)

"The most important of [the] considerations in establishing duty is forseeability. As a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' " (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434–435 [131 Cal.Rptr. 14, 551 P.2d 334] (*Tarasoff*), quoting *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669].)

■ Another general principle is "that, as a general matter, there is no duty to act to protect others from the conduct of third parties. [Citations.]" (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*); see *Williams, supra,* 34 Cal.3d at p. 23.) This general principle, however, is subject to a significant qualification, as *Delgado* also confirmed: "A defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special relationship' with the other person. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 858–866, pp. 220–233; 2 Dobbs, The Law of Torts (2001) §§ 317, 322–332 [citation].)" (*Delgado, supra,* 36 Cal.4th at p. 235.) Such can arise when the "defendant stands in some special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim of that conduct (see Rest.2d Torts [(1965)] §§ 315–320)." (*Tarasoff, supra,* 17 Cal.3d at p. 435.)

It has been observed that a typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent

upon the defendant who, correspondingly, has some control over the plaintiff's welfare." (*Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 499 [71 Cal.Rptr.2d 552], citing Prosser & Keeton, Torts (5th ed. 1984) § 56, p. 374.) Thus, and as our Supreme Court has noted, a special relationship has been found to exist between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees, and also between common carriers and passengers, innkeepers and their guests, and mental health professionals and their patients. (*Delgado, supra*, 36 Cal.4th at pp. 235–236.)

C. *There Exists a Special Relationship Between a Jailer and a Prisoner Giving Rise to a Duty of Care to Protect the Prisoner from Foreseeable Harm Inflicted by a Third Party*

Plaintiff's negligence claim was, as noted, premised on the existence of a special relationship between the prison employees and herself which, she claimed, gave rise to a duty to protect her from foreseeable harm—an issue that, surprisingly, no California court has apparently discussed, much less answered. But while California has not addressed the issue of whether the relationship of jailer and prisoner imposes a duty of care, recognition of such a duty finds support in numerous, if not all, pertinent authorities.

■ The Restatement Second of Torts, cited with approval by the California Supreme Court in *Delgado, supra*, 36 Cal.4th at page 236, says this in section 320: "Duty of Person Having Custody of Another to Control Conduct of Third Persons. [¶] One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor [¶] (a) knows or has reason to know that he has the ability to control the conduct of the third persons, and [¶] (b) knows or should know of the necessity and opportunity for exercising such control."

The comment to section 320 begins as follows: "*a*. The rule stated in this Section is applicable to a sheriff or peace officer, a jailer or warden of a penal institution . . . ." (Rest.2d Torts, § 320, com. a, p. 130.) The comments then go on, in comment c, with observations particularly apt here: "*c. Peculiar risks to which other exposed.* The custody of another may be taken under such circumstances as to associate the other with persons who are peculiarly likely to do him harm from which he cannot be expected to protect himself. If so, the actor who has taken custody of the other is required to exercise reasonable care to furnish the necessary protection. This is particularly true

where the custody not only involves intimate association with persons of notoriously dangerous character, but also deprives the person in custody of his normal ability to protect himself, as where a prisoner is put in a cell with a man of known violent temper, or is required to work or take exercise with a group of notoriously desperate characters. In such a case, the fact that the person in custody is a prisoner precludes the possession of any self-defensive weapons, and thus makes him incapable of adequately protecting himself." (*Id.*, com. c, p. 131.)

Professor Dobbs, likewise cited in *Delgado*, states the rule this way: "A person who has custody of another owes a duty of reasonable care to protect the other from foreseeable harm. A custodian may thus be held liable for failure to make reasonable efforts to protect a ward from a third person's attack or molestation and even to protect the ward from his own self-destructive inclinations. . . . [¶] *Jailers* . . . . Custodians include those who actually exercise control over their charges or who have legal authority to control them. One clear example is the jailer who holds prisoners in custody. By reason of his custody, the jailer owes the prisoner a duty of reasonable protection from attack . . . ." (2 Dobbs, The Law of Torts, *supra*, § 326, p. 884, fns. omitted.)

The Prosser and Keeton hornbook is similar: "The general duty which arises in many relations to take reasonable precautions for the safety of others may include the obligation to exercise control over the conduct of third persons. Certain relationships are protective by nature, requiring the defendant to guard his charge against harm from others. Thus, the duty of a carrier toward its passengers may require it to maintain order in its trains and stations, and to use reasonable care to prevent not only conduct which is merely negligent, but also physical attacks or thefts of property on the part of other passengers or strangers. A similar obligation rests upon innkeepers towards their guests, landlords toward their tenants, employers toward their employees, *jailers toward their prisoners*, hospitals toward their patients, schools toward their pupils, business establishments toward their customers, and landlords toward their tenants." (Prosser & Keeton, Torts, *supra*, Acts and Omissions, § 56, p. 383, italics added, fns. omitted.)

Such relationship, and its concomitant duty, is also the rule set forth in legal encyclopedias. (E.g., 60 Am.Jur.2d (2003) Penal and Correctional Institutions, § 181 ["A jailer, whether he is a sheriff or some other officer, owes a duty to the prisoner to keep him safe, to protect him from unnecessary harm, and to exercise reasonable and ordinary care for the prisoner's life and health"].) And in law review articles. (E.g., Robertson, *Fatal Custody: A Reassessment of Section 1983 Liability For Custodial Suicide* (1993) 24 U. Tol. L.Rev. 807, 826 ["'[T]ort law has long recognized that special

relationships override the 'no duty to rescue' rule. Some special relationships, such as master and servant, arose from the benefit derived from another's services. Other special relationships were created by virtue of one party becoming the caretaker of another, as occurs between passenger and common carrier and jailer and inmate." (Fns. omitted.)].)

That this is the rule is confirmed by the fact that apparently all cases that have considered the issue have recognized a duty owed by a jailer to a prisoner. Several cases hold that the duty arises because there is a special relationship, such as *Wilson v. City of Kotzebue* (Alaska 1981) 627 P.2d 623, where the Supreme Court of Alaska held: "We agree with the majority of courts which hold that a jailer owes a duty to the prisoner to exercise reasonable care for the protection of his life and health. [Citation.] This duty encompasses the duty to protect or assist a prisoner who is in danger, and is comparable to that owed by a common carrier to its passengers, because prisoners, like passengers, are confined and cannot avail themselves of normal opportunities for self-protection." (*Id.* at p. 628, fns. omitted.) Reaching this conclusion, the court specifically recognized that the relationship between a jailer and prisoner is a "special relationship[]." (*Ibid.*)

*Haworth v. State* (1979) 60 Haw. 557 [592 P.2d 820, 824], is similar: "It is well settled that a state, by reason of the special relationship created by its custody of a prisoner, is under a duty to the prisoner to take reasonable action to protect the prisoner against unreasonable risk of physical harm." Likewise *Thornton v. City of Flint* (1972) 39 Mich.App. 260 [197 N.W.2d 485, 493], where the court held, "The duty which defendant owed to plaintiff arose out of this special relationship in which defendant was one 'required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection.' "

In addition, an unbroken string of cases starting in 1935 has recognized a duty of care, though not necessarily expressing it in terms of a special relationship. (See, e.g., *Sanchez v. State* (N.Y.App.Div. 2007) 36 A.D.3d 1065 [827 N.Y.S.2d 338, 339] [" 'Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, [defendant] owes a duty of care to safeguard inmates, even from attacks by fellow inmates' . . . ."]; *Kemp v. Waldron* (N.Y.App.Div. 1985) 115 A.D.2d 869 [497 N.Y.S.2d 158, 159] ["correction officials have 'a duty to provide inmates with reasonable protection against foreseeable risks of attack by other prisoners' . . ."]; *Saunders v. State* (R.I. 1982) 446 A.2d 748, 750 ["prison officials owe a duty of ordinary or reasonable care to safeguard prisoners in their custody or control from attack by other prisoners"]; *Pretty On Top v. City of Hardin* (1979) 182 Mont. 311 [597 P.2d 58, 60] ["A jailer owes a duty to the prisoner to keep him safe and to protect him from unnecessary harm."];

*City of Belen v. Harrell* (1979) 93 N.M. 601 [603 P.2d 711, 713] ["When one party is in the custodial care of another, as in the case of a jailed prisoner, the custodian has the duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody."]; *Breaux v. State* (La. 1976) 326 So.2d 481 [penal authorities have a duty to use reasonable care to prevent foreseeable harm inflicted on one inmate by another]; *Porter v. County of Cook* (1976) 42 Ill.App.3d 287 [355 N.E.2d 561, 564] [jailers must exercise reasonable and ordinary care for the life and health of prisoner]; *Daniels v. Andersen* (1975) 195 Neb. 95 [237 N.W.2d 397, 401] [duty of police officer to exercise reasonable and ordinary care and diligence to prevent injury to a prisoner in his custody]; *Barlow v. City of New Orleans* (1970) 257 La. 91 [241 So.2d 501, 504] ["The duty of care owed one under arrest and in custody to keep him safe and protect him within reasonable limits from injury not attributable to his own willful act has been recognized by all courts."]; *Blakey v. Boos* (1967) 83 S.D. 1 [153 N.W.2d 305, 307] ["[W]hile the officer is not an insurer of the safety of his prisoners he has a duty to protect them from injury which he should have reasonably foreseen or anticipated."]; *Thomas v. Williams* (1962) 105 Ga.App. 321 [124 S.E.2d 409, 412–413] [sheriff owes a duty to keep the prisoner safe and free from harm]; *Smith v. Miller* (1950) 241 Iowa 625 [40 N.W.2d 597, 598] ["Aside from statutory requirements a sheriff owes a general duty to a prisoner to save him from harm and he is personally liable for negligence or wrongful acts causing the prisoner's injury or death."]; *Taylor v. Slaughter* (1935) 1935 OK 289 [171 Okla. 152, 42 P.2d 235, 236–237] [duty of sheriff to use reasonable care in protecting inmate from assault by other inmates].)

Federal law is in accord, as shown by *Farmer v. Brennan* (1994) 511 U.S. 825 [128 L.Ed.2d 811, 114 S.Ct. 1970]. Plaintiff Farmer, a preoperative transsexual with feminine characteristics, was placed in the general male prison population at a federal penitentiary, where she was allegedly beaten and raped by another inmate. (*Id.* at pp. 829–830.) Farmer filed a complaint against prison officials, alleging that by placing her in the general male population of a penitentiary with a known violent environment and history of inmate assault, and despite knowledge that she would be particularly vulnerable to sexual attack by other inmates, defendants acted with deliberate indifference to her safety in violation of the United States Constitution's Eighth Amendment's prohibition against cruel and unusual punishment. (511 U.S. at pp. 830–831.)

The district court granted summary judgment for the defendants, finding they did not act with deliberate indifference toward the plaintiff's safety. The court of appeals affirmed. (*Farmer v. Brennan, supra,* 511 U.S. at pp. 831–832.) Because different circuits had applied different standards for "deliberate indifference" (*id.* at p. 832), the United States Supreme Court granted certiorari and then concluded that a subjective standard applies: "[A]s

the lower courts have uniformly held, and as we have assumed, 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners' " (*id.* at p. 833).

█ In addition to all the above, two recent statutes cited in the brief filed by amicus curiae Stop Prisoner Rape instruct us. The first is the Prison Rape Elimination Act of 2003 (PREA), 42 United States Code section 15601 et seq., enacted by the United States Congress in 2003, which expressly states its purposes are to: "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States" (42 U.S.C. § 15602(1)), "increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape" (42 U.S.C. § 15602(6)), and "protect the Eighth Amendment rights of Federal, State, and local prisoners" (42 U.S.C. § 15602(7)). The second statute is the Sexual Abuse in Detention Elimination Act (SADEA). SADEA was enacted by the California Legislature in 2005, and set forth practices to be instituted by CDCR concerning the prevention of, and response to, sexual abuse in California prisons. (Pen. Code, §§ 2635–2643.) Indeed, CDCR acted to ensure compliance with PREA and SADEA, and in 2006 developed a Prison Rape Elimination Policy, memorialized in a manual detailing procedures for preventing, detecting, responding to, investigating, or tracking sexual abuse in CDCR facilities. (Cal. Dept. of Corrections and Rehabilitation, Dept. Operations Manual (2006) ch. 5, art. 44 <http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/DOM/Ch_5_Printed_Final_DOM.pdf> [as of Nov. 14, 2008].)

That, therefore, is the background against which we reach the issue before us: whether there is a special relationship between jailer and prisoner, imposing on the former a duty of care to the latter. We hold that there is.

█ As quoted above, the most important consideration "in establishing duty is forseeability." (*Tarasoff, supra,* 17 Cal.3d at p. 434.)[6] It is manifestly foreseeable that an inmate may be at risk of harm, as the recently enacted PREA and SADEA show, recognizing the serious problem presented by sexual abuse in the prison environment. As also noted, important factors in determining whether a relationship is "special" include vulnerability and dependence. Prisoners are vulnerable. And dependent. Moreover, the relationship between them is protective by nature, such that the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others. This, we conclude, is the epitome of a

---

[6] In expanding the law of duty in *Tarasoff* in the relationship there (psychotherapist-patient), the Supreme Court noted that "the courts have increased the number of instances in which affirmative duties are imposed not by direct rejection of the common law rule, but by expanding the list of special relationships which will justify departure from that rule. [Citation.]" (*Tarasoff, supra,* 17 Cal.3d at p. 435, fn. 5.)

special relationship, imposing a duty of care on a jailer owed to a prisoner, and we today add California to the list of jurisdictions recognizing a special relationship between jailer and prisoner.

Defendants advance four arguments against plaintiff's position. None is persuasive.

■ First, defendants take exception to plaintiff's reliance on out-of-state authorities, complaining that she did not present them to the trial court and therefore waived her right to argue them on appeal.[7] Simply put, defendants are wrong. They confuse the concepts of new issues not presented below—which generally cannot be raised for the first time on appeal (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2007) ¶ 8:229, p. 8-135 (rev. # 1, 2004))—with new legal authority for the issue being appealed. We are aware of no prohibition against citation of new *authority* in support of an *issue* that was in fact raised below, and *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 134 [68 Cal.Rptr.3d 568], the case cited by defendants, does not support such a proposition.

But whatever the rule as to *a party*, we are certainly not constrained by the authorities cited by the parties, as noted by Witkin over 30 years ago. In his manual setting forth our role in the process, in section 64, entitled "Independent Research By Court," he begins with this: "More and more appellate judges are beginning to agree with the assertion of the late Justice Peters of the California Supreme Court that 'independent research is indispensable to an efficient appellate system.' (See ABA, Committee Report, p. 23; on research programs for central staffs, see Meador, Appellate Courts p. 178 et seq. . . .)" (Witkin, Manual on Appellate Court Opinions (1977) § 64, p. 106.) Suffice to say, such independent research remains as "indispensable" today as it was in 1977. And the parties should rest assured we will uncover the applicable law.

Defendants next submit that the existence of a "special relationship" between a jailer and prisoner is unsupported by the law, arguing that plaintiff premised her theory on *Williams, supra,* 34 Cal.3d 18, which did not hold that prison personnel are in a special relationship with prisoners.[8] Maybe not, but we fail to see how that impacts our analysis.

---

[7] Defendants raise the same argument in their response to Stop Prisoner Rape's amicus curiae brief, claiming it is inappropriate to rely on PREA or SADEA, since plaintiff did not rely on these authorities below. But amicus curiae is not seeking to expand the issues on appeal, merely arguing an alternative basis for finding a duty of care owed by jailers to inmates. *Strong v. State Bd. of Equalization* (2007) 155 Cal.App.4th 1182, 1191, footnote 6 [66 Cal.Rptr.3d 657], cited by defendants, is thus inapposite.

[8] As defendants correctly explain, in *Williams* the court rejected plaintiff's argument that a highway patrol officer who "comes to the aid of an injured or stranded motorist creates an

Defendants next attempt to distinguish the four out-of-state authorities relied on by plaintiff—*Blakey v. Boos, supra,* 153 N.W.2d 305, *Pretty On Top v. City of Hardin, supra,* 597 P.2d 58, *Moore v. Murphy* (1963) 254 Iowa 969 [119 N.W.2d 759], and *Kemp v. Waldron, supra,* 497 N.Y.S.2d 158. Defendants argue these cases are factually different from the situation here, and urge that "[n]one of these cases hold [*sic*] that a prison official is in a 'special relationship' with an inmate . . . ." While the cases may not use that term, such distinction does not undermine the point for which plaintiff cites them: court after court after court has recognized that jailers owe prisoners a duty of care to protect them from foreseeable harm, whether stated specifically in terms of a "special relationship" or otherwise.

Defendants also urge us to affirm the dismissal of the negligence claim because plaintiff elected not to amend her complaint after the trial court sustained their demurrer. The law does not, however, mandate that a plaintiff amend his or her complaint simply because the trial court granted leave to do so. Instead, where a plaintiff declines to amend, the appellate court will presume the plaintiff has stated the strongest case possible, and all ambiguities and uncertainties will be resolved against him or her. (*Metzenbaum v. Metzenbaum* (1948) 86 Cal.App.2d 750, 752 [195 P.2d 492].)

Defendants' final position is that, in the event we disagree with the trial court's basis for sustaining the demurrer to the negligence claim, we affirm on the alternative grounds raised in the demurrer. We decline defendants' invitation for a variety of reasons, and hold that the matter be remanded for whatever further consideration is appropriate in light of our holding here.

We close our discussion with a caveat, necessary because of the manner in which the issue presents itself. Defendants' demurrer was, as noted, filed jointly on behalf of all defendants, and made the sweeping claim that no duty was owed by any defendant. Thus, no differentiation was made between or among defendants, no focus put on the position any particular defendant held at FSP or the role he or she was alleged to have played vis-à-vis plaintiff. It will also be recalled that the order sustaining the demurrer to the negligence claim was for "failure to plead cognizable duty," which order also did not differentiate between or among defendants.

■ Against that background, we issue this express caveat as to what it is we hold: there is a special relationship between jailer and prisoner which

---

affirmative duty to secure information or preserve evidence for civil litigation between the motorist and third parties," finding no special relationship between the motorist and the highway patrol officer under such circumstances. (*Williams, supra,* 34 Cal.3d at pp. 21, 27.) However, plaintiff cited *Williams* for its general discussion on the special relationship doctrine, not because the court recognized a special relationship between jailer and prisoner.

imposes a duty of care on the jailer to the prisoner. Who comes within the category of jailer is not before us, nor is the question of what law pertains to nonjailer defendants—questions that could not be decided on this record in any event. As Justice Sullivan aptly confirmed with respect to the "same subject, 'it is not the proper function of this Court to decide unripe issues, without the benefit of adequate briefing, not involving an actual controversy, and unrelated to a specific factual situation.' [Citation.]" (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 826 [119 Cal.Rptr. 858, 532 P.2d 1226].) Any such issues are left for another day.

### D. *There Is No Private Right of Action for Damages Arising out of an Alleged Violation of the Cruel or Unusual Punishment Clause of the California Constitution*

As noted, plaintiff's third cause of action sought damages for violation of article I, section 17 of the California Constitution, the prohibition against the infliction of cruel or unusual punishment. As also noted, after the evidence was concluded, the trial court granted defendants' motion to dismiss this claim, holding that "[i]t was the intent of the court not to allow the plaintiff to request damages for this constitutional violation, because there was no case law authorizing it." Plaintiff contends this ruling was error. We disagree.

We begin with discussion of *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300 [127 Cal.Rptr.2d 482, 58 P.3d 339] (*Katzberg*), where our Supreme Court set forth the framework for analyzing this issue, in the setting where plaintiff Katzberg sought monetary damages based on the defendants' alleged violation of his due process "liberty" interest under article I, section 7, subdivision (a) of the California Constitution. (29 Cal.4th at p. 303.) The court considered "whether an individual may bring an action for money damages on the basis of an alleged violation of a provision of the California Constitution, in the absence of a statutory provision or an established common law tort authorizing such a damage remedy for the constitutional violation," a question it ultimately answered in the negative. (*Ibid.*) Doing so, the court set forth the detailed framework for analyzing whether a constitutional provision affords a private right of action for damages: "[W]e conclude it is appropriate to employ the following framework for determining the existence of a damages action to remedy an asserted constitutional violation. First, we shall inquire whether there is evidence from which we may find or infer, within the constitutional provision at issue, an affirmative intent either to authorize or to withhold a damages action to remedy a violation. In undertaking this inquiry we shall consider the language and history of the constitutional provision at issue, including whether it contains guidelines, mechanisms, or procedures implying a monetary remedy, as well as any pertinent common law history. If we find any

such intent, we shall give it effect. [¶] Second, if no affirmative intent either to authorize or to withhold a damages remedy is found, we shall undertake the 'constitutional tort' analysis adopted by *Bivens*[ *v. Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388 [29 L.Ed.2d 619, 91 S.Ct. 1999]] and its progeny. Among the relevant factors in this analysis are whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision. If we find that these factors militate against recognizing the constitutional tort, our inquiry ends. If, however, we find that these factors favor recognizing a constitutional tort, we also shall consider the existence of any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages." (*Katzberg, supra*, 29 Cal.4th at p. 317.)

With this framework in mind, we turn to the cruel or unusual punishment clause in the California Constitution and, as directed by *Katzberg*, "begin our inquiry by asking whether, when the constitutional provision at issue was adopted, the enactors *intended* that it include a damages remedy for its violation" (*Katzberg, supra*, 29 Cal.4th at p. 317), a factor ignored in plaintiff's brief.

■ Article I, section 17 of the California Constitution provides in its entirety as follows: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." This language discloses on its face no intent with respect to a claim for damages. This by itself is not surprising, for as the Supreme Court noted, "with regard to most constitutional provisions, the words of the provision do not on their own manifest any such intent." (*Katzberg, supra*, 29 Cal.4th at p. 318.) So, we look for an implied right to seek damages which, as *Katzberg* observes, may be found in the provision's drafting history, as well as any materials that were before the voters when they adopted the measure. (*Katzberg, supra*, at p. 318.)

The prohibition against cruel or unusual punishment was first contained in the California Constitution of 1849, as section 6 of article I. It read as follows: "Excessive bail shall not be required, nor excessive fines imposed; nor shall cruel or unusual punishments be inflicted nor shall witnesses be unreasonably detained." We have reviewed the pertinent portions of the September and October 1849 debates in the Convention of California on the formation of the state Constitution, and have found no indication of any intent to create a private right of action when the prohibition became part of the original Declaration of Rights, as article I is known. (Browne, Rep. of Debates in Convention of Cal. on Formation of State Const. (1850).)

The 1849 Constitution was superseded by the Constitution of 1879, and the cruel or unusual punishment clause survived without substantive changes. Review of the debates that preceded adoption of the 1879 Constitution also reveals no intent to create a private right of action. (See Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878–1879, index, vols. 1–3.)

On November 5, 1974, the California electorate passed Proposition 7, which amended the Declaration of Rights by, among other things, adding the cruel or unusual punishment clause to the state Constitution in its current incarnation, as article I, section 17. We have reviewed the California Voters Pamphlet for the November 5, 1974 General Election, and again find nothing to suggest that the voters of California intended to create a private right of action for violation of the prohibition against cruel or unusual punishment. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) text of Prop. 7, p. 71.)

Despite that, we must consider whether the provision "nevertheless contains 'guidelines, mechanisms, or procedures from which a damages remedy could be inferred.' " (*Katzberg, supra*, 29 Cal.4th at p. 321.) We discern none, and instead understand the provision to merely " 'reflect[] general principles " ' "without laying down rules by means of which those principles may be given the force of law." ' " ' " (*Ibid.*) In sum, we have found no indication— either on the face of the constitutional provision or in its history—that the enactors intended article I, section 17 of the state Constitution to confer a private right of action for damages for a violation of the prohibition against the infliction of cruel or usual punishment.

*Katzberg* further instructs that we must now analyze "whether a constitutional tort action for damages to remedy the asserted constitutional violation should be recognized." (*Katzberg, supra*, 29 Cal.4th at p. 324.) Such question is to be considered in light of the three factors identified as relevant to this question, the first of which is "adequacy of existing remedies." (*Katzberg, supra*, 29 Cal.4th at p. 325.) As to this, plaintiff contends she had no adequate remedies because (a) the trial court dismissed her negligence claim, and (b) while injunctive and declaratory relief could protect her from future harm, they could not compensate her for the physical and psychological trauma she already suffered. On the other hand, defendants contend plaintiff had adequate remedies, suggesting, for example, that plaintiff could pursue a claim for violation of the Eighth Amendment to the federal Constitution or seek relief through the prison administrative process.

We conclude that there are adequate alternative remedies available for a claim such as that asserted by plaintiff here. First, we have concluded that California law imposes on at least some prison personnel a duty to protect

prisoners from foreseeable harm caused by other inmates, breach of which could give rise to a claim for negligence. Additionally, and as defendants point out, plaintiff had available a claim pursuant to 42 United States Code section 1983 for violation of the Eighth Amendment to the federal Constitution. (*Redman v. County of San Diego* (9th Cir. 1991) 942 F.2d 1435 [directed verdict for defendants reversed; jury could find deliberate indifference in placement of pretrial detainee in cell with homosexual with history of trying to coerce others into sexual favors when detainee was later allegedly raped]; see also *Farmer v. Brennan, supra*, 511 U.S. at p. 833.) The "availability of these adequate alternative remedies militates against judicial creation of a tort cause of action for damages in the circumstances presented." (*Katzberg, supra*, 29 Cal.4th at p. 327.)

The second *Katzberg* factor is whether allowing private damages claims for violation of California Constitution article I, section 17 would change existing law. (*Katzberg, supra*, 29 Cal.4th at p. 327.) Plaintiff fails to address this factor, while defendants argue "this factor militates against inferring a claim for damages under the cruel-or-unusual punishment clause because this would change existing tort law [since] no court has recognized a claim for damages under this constitutional provision." We agree with defendants.

The final factor we consider is the nature of the cruel or unusual punishment clause and "the significance of the purpose that it seeks to effectuate." (*Katzberg, supra*, 29 Cal.4th at p. 328.) It is important to note, however, that courts have cautioned against placing undue significance on this factor: "While this factor may be a proper consideration in the overall analysis, it is not one upon which we place great significance. How does one rank the importance of different constitutional provisions? . . . [C]an we say a procedural due process right should be accorded more or less dignity [than free speech or voting rights]? We agree that the due process right is fundamental. But absent the applicability of the other relevant factors discussed here, the relative importance of the constitutional right is of little help in determining the availability of a damages remedy for a violation of that right." (*Carlsbad Aquafarm, Inc. v. State Dept. of Health Services* (2000) 83 Cal.App.4th 809, 823 [100 Cal.Rptr.2d 87]; see also *Katzberg, supra*, 29 Cal.4th at p. 328.)

Undoubtedly, the prohibition against the infliction of cruel or unusual punishment is a significant constitutional right aimed at protecting, in plaintiff's words, "basic human dignity." However, when considered together with the other factors relevant to whether the claim for damages should be recognized—most significantly, the availability of adequate remedies—we conclude there is no basis to recognize a claim for damages under article I, section 17 of the California Constitution. Accordingly, we affirm the trial

court's dismissal of plaintiff's claim for damages resulting from defendants' alleged violation of the cruel or unusual punishment clause.

> E. *The Trial Court's Dismissal of Plaintiff's Prayer for Injunctive and Declaratory Relief As Moot Was Supported by Substantial Evidence*

Even in the absence of a private right of action for damages, an individual may maintain an action for equitable relief for ongoing violations of the state Constitution. (*Katzberg, supra,* 29 Cal.4th at p. 307.) Here, however, after plaintiff was paroled the trial court granted defendants' motion and dismissed plaintiff's claims for injunctive and declaratory relief on the ground these claims had become moot. Plaintiff contends this dismissal was error. Again, we disagree.

An issue becomes moot when some event has occurred which "deprive[s] the controversy of its life." (*Boccato v. City of Hermosa Beach* (1984) 158 Cal.App.3d 804, 808 [204 Cal.Rptr. 727].) The policy behind a mootness dismissal is that "courts decide justiciable controversies and will normally not render advisory opinions." (*Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174, 1179 [49 Cal.Rptr.3d 825].)

We review a trial court's determination of mootness for substantial evidence (*Boccato v. City of Hermosa Beach, supra,* 158 Cal.App.3d at p. 808), and conclude that the determination here was supported by substantial evidence. It is clear that upon plaintiff's parole she was no longer under the physical control of CDCR, and the challenged conduct no longer applied to her. Thus, any injunction or declaratory judgment would not impact her. Indeed, plaintiff's arguments in the trial court acknowledged as much. For example, plaintiff's first motion, seeking trial preference, moved for "trial preference in the interests of justice to prevent the injunction portions of this action from arguably becoming moot. She is a prison inmate who is going to parole in August [*sic*]. At that point, it the case [*sic*] would arguably become moot." Plaintiff's opposition to defendants' motion to continue the trial was similar, asserting that "plaintiff's claims will become moot and escape resolution on their merits if this case does not get to trial before [plaintiff] paroles on July 13, 2007."

Plaintiff seeks to avoid this conclusion by directing us to Penal Code section 3056, which provides that "Prisoners on parole shall remain under the legal custody of the department and shall be subject at any time to be taken back within the inclosure of the prison." Plaintiff fails to explain, however, how CDCR's legal, as opposed to physical, custody of her would perpetuate a controversy between her and defendants amenable to judicial resolution. The

question was not whether plaintiff remained in CDCR custody, as she argues, but whether there remained a controversy that could be resolved by the court in a manner that would affect her. And unless plaintiff was still in the *physical* custody of CDCR—and subject to the challenged housing policies—her requests for prospective relief could have no impact on her. Put another way, any ruling on plaintiff's equitable claims would have amounted to an advisory opinion, rendering of which " 'falls within neither the functions nor the jurisdiction of' " the court. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 860 [39 Cal.Rptr.2d 21, 890 P.2d 43].)

Alternatively, plaintiff relies on the doctrine of "constructive custody" in the context of habeas corpus petitions, arguing that such is sufficient to preserve the court's jurisdiction. Citing *In re Bandmann* (1958) 51 Cal.2d 388 [333 P.2d 339], plaintiff observes that "[i]n *habeas corpus* proceedings, the Court's jurisdiction to resolve a prisoner's prospective relief against the Department of Corrections is not disrupted by the prisoner's release on parole," which principle, plaintiff goes on to note, applies to those released on bail (*In re Petersen* (1958) 51 Cal.2d 177 [331 P.2d 24]) and those released from custody on their own recognizance. (*In re Smiley* (1967) 66 Cal.2d 606, 613 [58 Cal.Rptr. 579, 427 P.2d 179].) Critically—and as plaintiff herself acknowledges—no California authority has extended the doctrine of constructive custody to a civil lawsuit seeking prospective relief. We decline to do so here.

*McQuillion v. Schwarzenegger* (9th Cir. 2004) 369 F.3d 1091 is persuasive. McQuillion, who was serving a life sentence with the possibility of parole, filed a petition for a writ of habeas corpus alleging that rescission of his parole date by the Board of Prison Terms (Board) violated his due process rights. (*Id.* at p. 1094.) While his habeas corpus petition was pending, he (and others similarly situated) filed a complaint under 42 United State Code section 1983, charging that the Board and the Governor "administer[ed] California's parole statutes to achieve an unwritten, unconstitutional policy of denying parole to inmates convicted of certain offenses." (369 F.3d at p. 1094.) McQuillion sought monetary damages as well as injunctive and declaratory relief. (*Ibid.*) The district court dismissed his claims, and he appealed. (*Id.* at pp. 1094–1095.)

Before his United States Code section 1983 claim was resolved on appeal, McQuillion prevailed on his habeas corpus petition and was released. (*McQuillion v. Schwarzenegger, supra*, 369 F.3d at p. 1094.) As a result, in the appeal of his section 1983 claim, the Ninth Circuit considered whether his "successful habeas petition and subsequent release render[ed] his § 1983 action moot." (*McQuillion*, at p. 1095.) And as to the injunctive and declaratory relief claims, it concluded that it did, holding that: "McQuillion's

release extinguishes his legal interest in an injunction because it would have no effect on him." (*Ibid.*) "A judicial pronouncement, as it would relate to McQuillion, would be an advisory opinion, which the [United States] Constitution prohibits." (*Ibid.*)[9] (See also *Preiser v. Newkirk* (1975) 422 U.S. 395, 402–403 [45 L.Ed.2d 272, 95 S.Ct. 2330]; *Dilley v. Gunn* (9th Cir. 1995) 64 F.3d 1365, 1368 ["An inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action."].)

█ Alternatively, plaintiff argues that in the event that we affirm the trial court's mootness determination, her equitable claims fall under the "public importance" exception to the mootness doctrine such that either the trial court or this court should nevertheless consider them. Under that exception, "If an action involves a matter of continuing public interest and the issue is likely to recur, a court may exercise an inherent discretion to resolve that issue, even though an event occurring during its pendency would normally render the matter moot." (*Liberty Mut. Ins. Co. v. Fales* (1973) 8 Cal.3d 712, 715–716 [106 Cal.Rptr. 21, 505 P.2d 213]; see also *Mendoza v. County of Tulare* (1982) 128 Cal.App.3d 403, 413 [180 Cal.Rptr. 347].) We will not exercise any such discretion here.

To begin with, the issues plaintiff presents are essentially factual, a recognized basis to refuse to decide a moot case. (See *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 215 [130 Cal.Rptr.2d 564].) Beyond that, we lack an adequate record to address plaintiff's equitable claims. In short, nothing could come of our exercising our discretion to invoke the exception.

█ Lastly, plaintiff contends that defendants' "unclean hands" should bar them from asserting that her equitable claims are moot. According to plaintiff, despite the fact that she had been granted trial preference, defendants "maliciously" removed the matter to federal court after trial had commenced, just days before she was set to parole. This tactic, plaintiff submits, effectively denied her the opportunity to present her equitable claims to the trial court, a tactic that should not be rewarded. As defendants' point out, the unclean hands doctrine is an affirmative defense invoked by defendants to prevent a plaintiff from obtaining relief. (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 974 [90 Cal.Rptr.2d 743].) But even if the doctrine could be asserted by plaintiff, the record before us is inadequate for us to determine the factual issues pertinent to the issue. (See *Moriarty v. Carlson* (1960) 184 Cal.App.2d 51, 57 [7 Cal.Rptr. 282].)

---

[9] The court allowed McQuillion to proceed on his damages claim. (*McQuillion v. Schwarzenegger, supra,* 369 F.3d at p. 1096.)

## III.   DISPOSITION

The trial court's order sustaining defendants' demurrer to plaintiff's claim for negligence on the ground that she failed to allege a cognizable duty is reversed. The order dismissing the claim for violation of the cruel or unusual punishment clause and the prayers for injunctive and declaratory relief is affirmed. The matter is remanded to the trial court for further proceedings consistent with the above.

Kline, P. J., and Haerle, J., concurred.

Respondents' petition for review by the Supreme Court was denied February 11, 2009, S169316. Werdegar, J., did not participate therein.