Jerry LUM, et al., Plaintiffs,

v.

**COUNTY OF SAN JOAQUIN, et al., Defendants.**

**No. CIV. S–10–1807 LKK/DAD.**

United States District Court, E.D. California.

Nov. 18, 2010.

Peter J. Koenig, Walter H. Walker, III, Walker, Hamilton & Koenig, San Francisco, CA, for Plaintiffs.

Dana A. Suntag, The Suntag Law Firm, A Professional Corporation, Stockton, CA, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

This is a § 1983 civil rights and state law wrongful death action against San Joaquin County, the City of Lathrop, and multiple city and county employees. It arises out of the death of plaintiffs' son following his release from the San Joaquin County Jail. Defendants County of San Joaquin ("the County") and City of Lathrop ("the City") and Sergeants Walters and Pease ("the arresting officers") now move to dismiss portions of the first amended complaint. The City moves to dismiss plaintiff's first claim for unlawful arrest; the fifth claim for disability discrimination under the ADA; and plaintiff's sixth claim for wrongful death. The County moves to dismiss plaintiff's sixth claim for wrongful death. The arresting officers move to dismiss the ADA and wrongful death claims. The defendants also challenge plaintiffs' standing on all claims. For the reasons described herein, certain of the motions are GRANTED, others DENIED, and plaintiffs are GRANTED leave to amend their complaint.

## I. BACKGROUND

Plaintiffs' first amended complaint ("FAC") makes the following allegations:

### A. Plaintiffs and Decedent

Plaintiffs, Jerry Lum and Dorothea Timmons, are the parents, heirs, successors in interest, and survivors of the decedent, Jeremy Lum. (FAC at ¶ 4.) At the time of

his death, decedent was under psychiatric care for a bipolar disorder. (FAC at ¶ 21.) Decedent had a history of psychotic episodes, including hallucinations, which resulted in at least three admissions to St. Joseph's Behavioral center in Stockton, California. (FAC at ¶ 21.) Decedent used prescription medications to control his bipolar disorder, including anti-seizure and anti-psychotic medications. (FAC at ¶¶ 21, 42.) Despite his diagnosis, however, decedent was able to maintain employment and participate in athletics. (FAC at ¶ 22.)

On July 8, 2009, at approximately 11:00 pm, one of decedent's neighbors observed that decedent was "not in his right mind, and appeared disoriented and lost". In addition the decedent was barefoot and had vomit on his shirt. (FAC at ¶ 27–28.) The neighbor, Mr. Archuleta, contacted police after decedent came up onto his porch, looking for a girl named "Adriana." (FAC at ¶¶ 27, 30.) Mr. Archuleta did not know "Adriana" or decedent. (FAC at ¶ 27.) Mr. Archuleta also told police that decedent was "gazing past his line of sight as if he was looking at nothing, and pacing back and forth, confused." (FAC at ¶ 28.)

After leaving the Archuleta residence, decedent was seen walking across the street near a local bar, crossing a busy street toward the City Park, and standing "with his arms wrapped around a post." (FAC at ¶ 29.) A bartender walking home from work encountered decedent while he was standing with his arms around the post and asked decedent if he was "okay." (FAC at ¶ 29.) Decedent told the bartender that he was "okay." (FAC at ¶ 29.) The bartender found decedent's behavior to be "unusual," but he did not believe decedent to be drunk. (FAC at ¶ 29.)

**B. The Arresting Officers**

Decedent was arrested at approximately 1:00 am on July 9, 2009, in response to Mr. Archuleta's call. (FAC at ¶ 31.) Once decedent was under police custody, Archuleta asked police "[w]hat's the problem?" One of the sergeants responded, "[h]e's probably just off his meds." (FAC at ¶ 30.) The arresting officers booked decedent into the San Joaquin County Jail on a "kickout" charge, meaning that he would be released from jail six hours later. (FAC at ¶ 31.)

When decedent was arrested he had a laceration on his foot, difficulty walking, vomit on his shirt, and was behaving strangely. (FAC at ¶ 35.) The arresting officers did not take any action to evaluate decedent's physical or mental state or inquire as to whether hospitalization, or an involuntary hold, pursuant to California Welfare & Institutions Code sections 5150 or 5170, was necessary. (FAC at ¶ 35.)

According to later accounts by the arresting officers, decedent smelled of alcohol; however, no one else that had encountered decedent that night smelled alcohol on him or suspected that he had been drinking. (FAC at ¶ 32.) Defendants tested decedent's blood alcohol level and found none in his system. (FAC at ¶ 33.) Plaintiffs suspect that decedent was hallucinating as he stood up every 30 seconds saying he saw or heard somebody who was not there, but other than that, decedent was cooperative with police. (FAC at ¶ 34.)

**C. The County Jail**

After his arrest, decedent was booked into the San Joaquin County Jail. (FAC at ¶ 35.) Officer Mendoza was working in the booking area when decedent was brought in for being "under the influence in public" and "he specifically remember[ed] Jeremy Lum telling him that he had bipolar disorder and takes [sic] medication." (FAC at ¶ 37.) Officer Mendoza observed decedent "bouncing off the walls and attempting to open imaginary doors and speaking to himself." (FAC at ¶ 38.)

While decedent was in his holding cell, he had hallucinations and also suffered from a seizure. (FAC at ¶ 38.) The jail staff did not order a medical or psychiatric evaluation or otherwise obtain medical treatment for decedent. (FAC at ¶¶ 38–39.) Decedent was released from the County jail on July 9, 2010, at 7:36 am, "without successful family notification, transportation, money, phone, or shoes." (FAC at ¶ 40.)

## D. After Decedent's Release From County Jail

By approximately 6:00 pm on July 9, 2009, decedent had not returned home; his family commenced a search for him and soon learned of his arrest and release from jail. (FAC at ¶ 41.) Later that evening, the family filed a missing person's report and tried to impress upon the police decedent's need for medication. (FAC at ¶ 42.) The search was to no avail and at approximately 5:00 pm on July 12, 2009, decedent's body was found floating in the San Joaquin River, approximately two miles west of the County jail. (FAC at ¶ 44.) The San Joaquin County Coroner's report concluded that the cause of death was accidental drowning with MDMA (ecstasy) and Orphenadrine intoxication. (FAC at ¶ 45.) None of decedent's regular prescription medications were found in his system. (FAC at ¶ 45.)

## II. STANDARD FOR A FED. R. CIV. P. 12(B)(6) MOTION TO DISMISS

A Fed.R.Civ.P. 12(b)(6) motion challenges a complaint's compliance with the pleading requirements provided by the Federal Rules. In general, these requirements are established by Fed.R.Civ.P. 8, although claims that "sound[ ] in" fraud or mistake must meet the requirements provided by Fed.R.Civ.P. 9(b). *Vess v. Ciba–Geigy Corp.*, 317 F.3d 1097, 1103–04 (9th Cir.2003).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must give defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation and modification omitted).

To meet this requirement, the complaint must be supported by factual allegations. *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). "While legal conclusions can provide the framework of a complaint," neither legal conclusions nor conclusory statements are themselves sufficient, and such statements are not entitled to a presumption of truth. *Id.* at 1949–50. *Iqbal* and *Twombly* therefore prescribe a two step process for evaluation of motions to dismiss. The court first identifies the non-conclusory factual allegations, and the court then determines whether these allegations, taken as true and construed in the light most favorable to the plaintiff, "plausibly give rise to an entitlement to relief." *Id.*; *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).[1]

"Plausibility," as it is used in *Twombly* and *Iqbal*, does not refer to the likelihood

---

**1.** As discussed below, the court may consider certain limited evidence on a motion to dismiss. As an exception to the general rule that non-conclusory factual allegations must be accepted as true on a motion to dismiss, the court need not accept allegations as true when they are contradicted by this evidence. *See Mullis v. United States Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir.1987), *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir.1987).

that a pleader will succeed in proving the allegations. Instead, it refers to whether the non-conclusory factual allegations, when assumed to be true, "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). A complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990).

The line between non-conclusory and conclusory allegations is not always clear. Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). While *Twombly* was not the first case that directed the district courts to disregard "conclusory" allegations, the court turns to *Iqbal* and *Twombly* for indications of the Supreme Court's current understanding of the term. In *Twombly,* the Court found the naked allegation that "defendants 'ha[d] entered into a contract, combination or conspiracy to prevent competitive entry ... and ha[d] agreed not to compete with one another,'" absent any supporting allegation of underlying details, to be a conclusory statement of the elements of an antitrust claim. *Id.* at 1950 (quoting *Twombly,* 550 U.S. at 551, 127 S.Ct. 1955). In contrast, the *Twombly* plaintiffs' allegations of "parallel conduct" were not conclusory, because plaintiffs had alleged specific acts argued to constitute parallel conduct. *Twombly,* 550 U.S. at 550–51, 556, 127 S.Ct. 1955.

*Twombly* also illustrated the second, "plausibility" step of the analysis by providing an example of a complaint that failed and a complaint that satisfied this step. The complaint at issue in *Twombly* failed. While the *Twombly* plaintiffs' allegations regarding parallel conduct were non-conclusory, they failed to support a plausible claim. *Id.* at 566, 127 S.Ct. 1955. Because parallel conduct was said to be ordinarily expected to arise without a prohibited agreement, an allegation of parallel conduct was insufficient to support the inference that a prohibited agreement existed. *Id.* Absent such an agreement, plaintiffs were not entitled to relief. *Id.*[2]

In contrast, *Twombly* held that the model pleading for negligence demonstrated the type of pleading that satisfies Rule 8. *Id.* at 565 n. 10, 127 S.Ct. 1955. This form provides "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C.App., p. 829. These allegations adequately "'state[ ] ... circumstances, occurrences, and events in support of the claim presented.'" *Twombly,* 550 U.S. at 556 n. 3, 127 S.Ct. 1955 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, at 94, 95 (3d ed.2004)). The factual allegations that defendant drove at a certain time and hit plaintiff render plausible the conclusion that defendant drove negligently.

---

**2.** This judge must confess that it does not appear self-evident that parallel conduct is to be expected in all circumstances and thus would seem to require evidence. Of course, the Supreme Court has spoken and thus this court's own uncertainty needs only be noted, but cannot form the basis of a ruling.

## III. ANALYSIS

Defendants move to dismiss plaintiffs' first claim, as to the City; plaintiff's fifth claim as to both the City and the arresting officers; and the sixth claim for relief as to the City, the County, and the arresting officers for failure to state a claim for relief under Rule 12(b)(6). Defendants also seek to dismiss each of Plaintiffs' first through fifth and seventh claims in their entirety for lack of standing.

### A. Plaintiff's First Claim: 42 U.S.C. § 1983 (Alleged Violation Of Decedent's Fourth Amendment Rights)

■ Plaintiffs allege as their first claim a violation of 42 U.S.C. § 1983 against the arresting officers, the City, and "Does 1–25." (FAC at ¶¶ 54–59.) Plaintiffs base this claim on their assertion that the defendants unlawfully arrested decedent. (FAC at ¶ 55.) Defendants contend that this claim should be dismissed as to the City because plaintiffs have not established municipal liability.

Title 42 U.S.C. § 1983 provides in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ Because a municipality cannot be held liable for a violation of Section 1983 solely because it employs a tortfeasor, plaintiff must first show that the municipal action was taken with the requisite degree of culpability and must demonstrate a causal link between the municipal action and the deprivation of federal rights.

*Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Plaintiffs may accomplish this by proving one of three conditions:

(1) A city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;

(2) The individual who committed the constitutional tort was an official with final policy-making authority and therefore the challenged action itself constituted an act of official governmental policy; or

(3) An official with final policy-making authority ratified a subordinate's unconstitutional action and the basis for it. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996).

Defendants contend that plaintiffs have alleged no factual predicate for inferring that the City has an official policy or custom that leads to unlawful arrests. (Def's Mtn. Dis. at 7: 3–5.) Plaintiffs counter that they are not alleging "a formal governmental policy or a longstanding practice or custom," rather that the arresting officers had final policy-making authority and either violated the constitution themselves or ratified a subordinate's unconstitutional action and the basis for it. Defendants argue that even if plaintiffs proceed under this theory, they plead only conclusory factual allegations in support of their proposition.

■ In order to establish municipal liability, Plaintiffs must plead facts that establish a single or recurring unconstitutional action by an individual with "final policy-making authority." Generally speaking, whether an individual has "final policy-making authority" with regard to the challenged action is a matter of state

law. *St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business").

The court disagrees with plaintiffs' proposition that state law is merely a "starting point" for our analysis, (*see* Pl's Oppo. at 6, n. 3). This issue remains unresolved, but the plurality in *Praprotnik* explicitly disagreed with this assessment. However, the High Court has not precluded municipal liability in situations where an official who possesses such authority delegates it and creates a "custom or usage" having the force of law.

Plaintiffs allege that "in the City of Lathrop, police sergeants, including Sergeant Walters and Pease, are invested by law-or by a 'custom or usage' having the force of law-with 'final policymaking authority' to effect arrests and/or ratify or sanction arrests made by other officers." (FAC at ¶ 56.) They further allege, based on this assertion, that "Sergeant Walters and Pease were acting as municipal officials with 'final policymaking authority' when they effected and/or ratified or sanctioned Jeremy Lum's arrest." (FAC at ¶ 56.)

The court finds that plaintiffs have pled sufficient facts to maintain a claim for municipal liability under Section 1983. The court is required to assume the non-conclusory factual allegations of the complaint are true, and construe them in the light most favorable to the plaintiffs. Plaintiffs have pled facts indicating, at least plausibly that decedent was wrongfully arrested (decedent was booked on a

public intoxication charge although he did not any alcohol in his blood, while police conceded that he was "probably just off his meds").

The complaint further alleges that the decision to arrest and book on a "kickout" charge, as opposed to the decision to pursue other alternatives, was made by the arresting officers, and that sergeants in the City of Lathrop customarily have the final authority regarding these arrests. These allegations adequately " 'state[ ] . . . circumstances, occurrences, and events in support of the claim presented.' " *Twombly*, 550 U.S. at 556 n. 3, 127 S.Ct. 1955 (quoting C. Wright & A. Miller, Federal Practice and Procedure § 1216 at 94, 95). The factual allegations that the arresting officers made the independent and seemingly discretionary decision to unlawfully arrest decedent, renders plausible the conclusion that sergeants generally have at least been delegated final policymaking authority as to arrests in the City of Lathrop.[3]

The court finds that plaintiffs have pled a factual predicate that gives rise to a plausible finding of municipal liability as to plaintiffs' Section 1983 claim. Accordingly, defendants' motion to dismiss plaintiff's first claim for relief for unlawful arrest is DENIED.

Moreover, it appears to the court that the existence of a "kickout" arrest suggests a policy which, under the facts and circumstances of this case, perhaps raise a plausible basis for municipal liability. Accordingly, if the facts support such a cause of action, plaintiffs are GRANTED leave to amend their complaint to state a claim under the first theory of municipal liabili-

---

**3.** At oral argument defendants contended that the 9th Circuit has held that police sergeants do not have final authority as a mater of law, relying on *Collins v. City of San Diego*, 841 F.2d 337 at 341 (9th Cir.1987). Collins is clearly distinguishable, addressing as it does the question of hiring and firing. In any event, here plaintiffs rely on long-standing practice to establish authority, a matter not addressed by *Collins*.

ty; that the City of Lathrop had a policy or custom and usage that resulted in a violation of decedent's Fourth Amendment rights.

## B. Plaintiffs' Fifth Claim: Violation Of The Americans With Disabilities Act (ADA)

Plaintiffs' fifth claim is that the arrest and detention of decedent violated the Americans with Disabilities Act. City defendants argue, relying on *Foley v. Klickitat County*, No. CV–08–3068, 2009 WL 5216992 (E.D.Wa. Dec. 30, 2009), that plaintiffs' fifth claim fails as to both the arresting officers and the city because the ADA does not apply to arrests. The County is not moving to dismiss the ADA claim against it. Defendants also contend that even if the ADA applies to incarcerated individuals, the arresting officers, who are city employees, cannot be liable because they no longer had custody of decedent after booking him into the San Joaquin County Jail, and therefore the City also cannot be liable because there is no *respondeat superior* relationship between the County jail and the City. (Def's Mtn. Dis. at 11: 15–19.)

Plaintiffs respond arguing that *Foley* is not binding on this court and further, that it is not persuasive because it is merely a cursory analysis of the ADA. (Pl's Oppo. at 7: 13–16.) Plaintiffs base their contention on the reasoning contained within several district court decisions, as well as the Ninth Circuit opinion in *Thompson v. Davis*, 295 F.3d 890 (9th Cir.2002) (holding that decisions to parole constitute an "activity of a public entity" that falls within the reach of the ADA.)[4]

For the reasons discussed below, the court agrees with plaintiffs' assessment of

the ADA. However, the court finds that the ADA does not apply to individual officers; therefore, defendants motion is GRANTED as to the arresting officers and DENIED as to the City.

Title II of the ADA, 42 U.S.C. § 12132, prohibits a public entity from discriminating against a qualified individual with a disability on the basis of disability. *Weinreich v. L.A. County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir.1997). To state a claim of disability discrimination under Title II, the plaintiff must allege four elements:

> (1) [P]laintiff is an individual with a disability; (2) plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Weinreich*, 114 F.3d at 978.

The Ninth Circuit has not addressed the question of whether the ADA applies to arrests. *See Thompson*, 295 F.3d at 897. However, that court has determined that local law enforcement agencies' activities fall within the statute. 42 U.S.C. § 12131(1); *Lee v. City of L.A.*, 250 F.3d 668, 691 (9th Cir.2001) (citing *Gorman v. Bartch*, 152 F.3d 907, 912–13 (8th Cir.1998) (holding that transportation of an arrestee to a police station is a "service" under the ADA)).

There are two theories generally recognized by courts in applying the ADA in the context of arrests. *See Gohier v. Enright,*

---

4. Plaintiffs also contend that even if the court does not find that an arrest is the type of "service, program or activity" contemplated by the ADA, this would not dispense with the

entirety of plaintiffs' fifth claim because plaintiffs are also contesting the legality of decedent's arrest. Given the disposition above the court need not consider this argument.

186 F.3d 1216, 1221 (10th Cir.1999). First, where police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. *Id.* at 1220. Second, where although police have properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. *Id.* at 1220–21 (citing *Gorman*, 152 F.3d at 912–13 (holding such claim viable); *Rosen*, 121 F.3d at 157–58 (suggesting in *dicta* such claim not viable); *Patrice v. Murphy*, 43 F.Supp.2d 1156 (W.D.Wash.1999) (holding such claim not viable.))

Plaintiffs are alleging both theories, therefore, the court must address the applicability of both. For the reasons discussed below, the court finds that the weight of Ninth Circuit authority, as well as the persuasive authority on point, leads to the conclusion that both theories are viable under the ADA.

■ The first scenario, where an individual is wrongfully arrested, fits squarely within the ADA's prohibition against discrimination upon the basis of a disability. *See Weinreich*, 114 F.3d at 978 ("in order to maintain an ADA claim, plaintiff must allege that plaintiff was either excluded ... *or was otherwise discriminated against by the public entity*.") (emphasis added).

■ In the event that decedents' arrest was found lawful, the second theory is equally viable, as the court finds that arrests are "activities" of a public entity. In *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, the Ninth Circuit interpreted Title II's "programs" and "activities" to include " 'all of the operations of' a qualifying local government." 179 F.3d 725, 731 (9th Cir.1999). In reaching this conclusion, the court noted that Congress specifically rejected an approach that could have left room for exceptions to § 12132's prohibition on discrimination by public entities. *Id.* at 732. This broad interpretation of the ADA was confirmed by *Lee v. City of L.A.* when the court stressed that "[q]uite simply, the ADA's broad language brings within its scope 'anything a public entity does,' " 250 F.3d at 691 (quoting *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 171 & n. 5 (3d Cir. 1997), aff'd 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998)); *see also McGary v. City of Portland* 386 F.3d 1259, 1268 (9th Cir.2004) ("the ADA must be construed broadly in order to effectively implement the ADA's fundamental purpose").

This broad interpretation of the ADA has led the Ninth Circuit to additionally warn against "carving out 'spheres in which public entities may discriminate on the basis of an individual's disability.' " *McGary*, 386 F.3d at 1269 (quoting *Thompson*, 295 F.3d at 899.) In *Thompson*, the Ninth Circuit rejected an attempt to exempt parole decisions from the ADA under the reasoning that the ADA does not reach substantive decision-making in the context of the criminal law. The court cited with approval the Tenth Circuit's holding that the ADA applies to arrests. *Id.* at 897 (citing *Gohier*, 186 F.3d at 1221 ("[A] broad rule categorically excluding arrests from the scope of Title II ... is not the law.")).

The court also noted that under the ADA regulations, law enforcement is obligated to modify "policies that result in discriminatory arrests *or abuse of individuals with disabilities.*" *Thompson*, 295 F.3d at 897 (quoting 28 C.F.R. Pt. 35, App. A § 35.130 (2000)) (emphasis added). The court distinguished the Fourth Circuit's holding in *Rosen v. Montgomery County Maryland*, 121 F.3d 154 (4th Cir.1997),

because that decision was not based upon a concern that the ADA would impermissibly interfere with the substantive decisions involved in arrests. Rather, reasoning that the statutory text of the ADA implied voluntariness on the part of the individual, it held that an arrest was not a "program or activity" of the defendant County. *Id.* at 157–58. This reasoning has now been discredited by the Supreme Court. *Yeskey*, 524 U.S. at 211, 118 S.Ct. 1952 ("[T]he words [of § 12132] do not connote voluntariness.").

■ Considering the Ninth Circuit's broad interpretation of the ADA, it seems antithetical to established case law to "carve out" an exception for arrests. Arrests are both subject to the ADA's prohibition against discrimination on the basis of disability and the duty to provide reasonable accommodations during arrests. Accordingly, the motion to dismiss plaintiff's ADA claim is DENIED. Clearly, however, the ADA, by its terms does not apply to the officers.

## C. Plaintiffs' Sixth Claim For Wrongful Death/Negligence and the California Torts Claim Act Immunities

Plaintiffs' sixth claim alleges that the defendants were negligent and are thus liable for decedent's death. Plaintiffs allege that "[t]he arresting officers ignored the laceration on Jeremy's foot, Jeremy's difficulties walking, the vomit on Jeremy's shirt, and Jeremy's strange behavior which a reasonable officer in Defendants' position should have attributed to something other than alcohol intoxication; they did not take any action to evaluate Jeremy's physical or mental state or inquire as to whether hospitalization, or an involuntary hold, pursuant to Cal. Welfare & Institutions Code §§ 5150 or 5170, was necessary, instead of arresting and booking Jeremy in the San Joaquin County Jail on 'kickout' charges." (FAC at ¶ 35.)

Plaintiffs further allege that the act of arresting decedent created a "special relationship" and a correlating duty "not to leave him in a situation that was more dangerous than the one in which they found him." (FAC at ¶¶ 96–97.) Plaintiffs state that "defendants breached this duty by failing to give decedent a medical or psychiatric evaluation and/or treatment and by deciding to release him alone six miles from his home without money, shoes, a cellular phone, means of transportation and without means or wherewithal to get home, shelter, or assistance." (FAC at ¶ 98.)

Plaintiffs allege that defendants arresting officers left decedent in a dangerous situation by placing him in jail on a "kickout" charge because "the Arresting Officers knew or should have known that the County had a policy of releasing 'kickouts' after an arbitrary period of time." (FAC at ¶ 36.) Defendants argue that plaintiffs' negligence and wrongful death claims fail due to the "numerous and broad immunities" contained in the California Torts Claim Act.[5]

"Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the

---

5. Defendants also assert that plaintiffs' Seventh Claim for "False Arrest" is also precluded by the various immunities contained in the Torts Claim Act; however, under California law, a police officer is not granted statutory immunity for false arrest and imprisonment. *See Asgari v. City of Los Angeles*, 15 Cal.4th 744, 752, 63 Cal.Rptr.2d 842, 937 P.2d 273 (1997). Government Code § 820.4, which grants immunity for a public employee's "act or omission, exercising due care, in the execution or enforcement of any law," provides that: "nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."

absence of such immunity." *Davidson v. City of Westminster*, 32 Cal.3d 197, 201–02, 185 Cal.Rptr. 252, 649 P.2d 894 (1982). Therefore the court must first address whether, under California law, the defendants owed a duty of care to decedent.

### i. Defendants Owed Decedent A Duty Of Care

■ Plaintiffs argue that when the arresting officers took decedent into custody, a special relationship and corresponding duty to act reasonably to protect decedent was created.

■ The elements of a cause of action for negligence include a legal duty to use due care. *Evan F. v. Hughson United Methodist Church*, 8 Cal.App.4th 828, 834, 10 Cal.Rptr.2d 748 (3d Dist.1992). The existence of a duty of care is a question of law to be determined by the court alone. *Ballard v. Uribe*, 41 Cal.3d 564, 572, fn. 6, 224 Cal.Rptr. 664, 715 P.2d 624 (1986). This is because "legal duties are ... merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).

■ A person who has not created a peril is not liable in tort merely for failure to take affirmative action to protect another unless there is some relationship between them that gives rise to a duty to act. *Williams v. State of California*, 34 Cal.3d 18, 23, 192 Cal.Rptr. 233, 664 P.2d 137 (1983). In the absence of a clearly established special relationship, the court should apply the multi-factor public policy analysis first articulated in *Rowland v. Christian*, 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561 (1968). For the reasons discussed below, the Court finds that there is a well-established special relationship between jailers and prisoners that is equally applicable to officers of the law who take arrestees into custody. *See Giraldo v. Cal. Dep't of Corr.*, 168 Cal.App.4th 231, 85 Cal.Rptr.3d 371 (3d Dist.2008).

In *Giraldo*, the court addressed, as an issue of first impression, whether jailers have a duty to protect inmates from foreseeable harm by third parties. 168 Cal. App.4th at 250, 85 Cal.Rptr.3d 371. In that case, plaintiff, a male-to-female transgender person, was an inmate in the California prison system. *Id.* at 237, 85 Cal. Rptr.3d 371. Plaintiff filed an action against the California Department of Corrections and Rehabilitation (CDCR) and various CDCR personnel "challeng[ing] prison policies that place transgender inmates, such as [plaintiff], who have the physical appearance of women, in the male inmate population without any meaningful precaution to the obvious risk of sexual assault to them." *Id.*

In finding a duty, the court reasoned that "it has been observed that a typical setting for the recognition of a special relationship is where 'the plaintiff is particularly vulnerable and dependent' upon the defendant who, correspondingly, has some control over the plaintiff's welfare." *Giraldo*, 168 Cal.App.4th at 245–46, 85 Cal. Rptr.3d 371 (quoting *Kockelman v. Segal*, 61 Cal.App.4th 491, 499, 71 Cal.Rptr.2d 552 (1998)). The Court cited expansive authority for finding that a "special relationship" existed between jailer and prisoner, including legal encyclopedias, the Restatement (Second) of Torts, and both state and federal case law. *Id.* at 246–50, 85 Cal.Rptr.3d 371.

Ultimately, the Court based its decision on two factors, foreseeability and vulnerability/dependence. *Id.* at 250, 85 Cal. Rptr.3d 371. The Court found that it was "manifestly foreseeable that an inmate may be at a risk of harm [as recently passed legislation] recognizing the serious problem presented by sexual abuse in the

prison environment." *Id.* As here, it is reasonably foreseeable that an arrestee who is in need of medical attention would be at risk in a custodial environment or upon release into a situation made dangerous by his medical condition, or without first having received proper medical attention.

Both prisoners and arrestees are equally vulnerable and dependent on officers and jailers for safety and security. "Prisoners are vulnerable. And dependent. Moreover, the relationship between them is protective by nature, such that the jailer has control over the prisoner, *who is deprived of the normal opportunity to protect himself.*" *Id.* at 250, 85 Cal.Rptr.3d 371. In this case, the purpose of arresting decedent, who was "just off of his meds," on a "kickout" charge, was at least partially for decedent's own self protection, making the restraint used by the arresting officers just as "protective in nature" as the custodial relationship that exists between jailer and prisoner.

Abiding by the precedent set in *Giraldo,* the court finds that the jailer-prisoner relationship creates a duty of care as to the County. The court further finds the relationship to be analogous to law enforcement officers and arrestees. Officers and jailers have a duty to act with reasonable care toward those in their custody.

**i. Government Code Section 845.8**

■ Defendant contends that plaintiffs' sixth claim is barred by Government Code Section 845.8(a), which provides:

> Neither a public entity nor a public employee is liable for: (a) Any injury resulting from determining whether to parole or release a prisoner or from determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release.

Plaintiffs make several arguments in opposition to this contention. First, they argue that decedent was not a "prisoner" at the time of the injury (i.e. when he drowned in the river). Second, they assert that this situation is not within the scope of what the legislature intended Section 845.8 to prevent. Third, they assert that even if the court finds this section to be applicable, it can only apply to the County because at the time of the arrest, decedent was not a prisoner. Finally, they take issue with defendants' characterization of this immunity as "absolute."

The court finds that this immunity does not extend to the City or its officers, as the statute specifically deals with decisions to release prisoners, not decisions to arrest individuals or book arrestees into jail. The court also agrees with plaintiffs' proposition that this statutory immunity is not "absolute."

In *Johnson v. State of California,* (1968), the California Supreme Court discussed the scope of Section 845.8(a) immunity, in the context of a claim of immunity by the state for injuries arising out of the Youth Authority's decision to place a dangerous youth who was on parole in a foster home. 69 Cal.2d 782, 784–785, 73 Cal. Rptr. 240, 447 P.2d 352 (1968). The youth had displayed homicidal tendencies, including violence and cruelty to both animals and people, none of which was revealed to the foster parents. *Id.* The youth subsequently assaulted one of the foster parents. *Id.* at 785, 73 Cal.Rptr. 240, 447 P.2d 352.

The Court held that the state's decision whether to warn the foster parents of the youth's dangerous propensities was not within 845.8(a)'s immunity for an injury resulting from a determination to parole or release a prisoner because "[o]nce the proper authorities have made the basic policy decision-to place a youth with foster

parents, for example, the role of section 845.8 immunity ends." *Johnson,* 69 Cal.2d at 786, 799, 73 Cal.Rptr. 240, 447 P.2d 352. The Court reasoned that there is an important distinction between basic or discretionary decisions on the one hand and ministerial decisions implementing the basic decision on the other hand. *Id.* That is, actions implementing the basic policy decision are outside the scope of the immunity.

As plaintiffs contend, that distinction applies in the instant case. Plaintiffs allege that the injuries to decedent resulted from "ministerial acts" made after the initial decision to release decedent. Government Code Section 845.8(a) does not preclude plaintiffs from raising a plausible claim for wrongful death against the County, the City or the arresting officers under this theory; however, insofar as the negligence charged is the basic decision to release decedent, there can be no liability.

### ii. Government Code Section 846

■ Defendant contends that plaintiffs' sixth claim is also barred by Government Code § 846, which provides in relevant part "{n}either a public entity not a public employee is liable for injury caused by . . . the failure to retain an arrested person in custody." Defendants assert that this language is "clear" and that neither the City nor the County nor its employees can be held liable for the fact that they did not retain decedent in custody. Again plaintiffs argue that section 846 does not apply in instances where officers have a "special relationship" with the arrested person. (Pl's Opp. at 17: 10–12.)

Plaintiffs argument is misplaced. The existence of a "special relationship" is not an exception to immunity under § 846. Cases that discuss the issue of "special relationship" in relation to government immunities do so in the context of whether there is a duty of care. The duty question is the threshold to a discussion of govern-ment immunity, *see Davidson,* 32 Cal.3d at 201–02, 185 Cal.Rptr. 252, 649 P.2d 894, and the issues are distinct. The cases that deny plaintiff recovery do not do so because the courts have found governmental immunity but because the applicable officers lacked a duty of care in relation to the plaintiffs or victims. *See Jackson v. Clements,* 146 Cal.App.3d 983, 194 Cal.Rptr. 553 (1st Dist.1983); *City of Sunnyvale v. Superior Court,* 203 Cal.App.3d 839, 250 Cal. Rptr. 214 (6th Dist.1988); *Lehto v. City of Oxnard,* 171 Cal.App.3d 285, 217 Cal.Rptr. 450 (2d Dist.1985); *Stout v. City of Porterville,* 148 Cal.App.3d 937, 196 Cal.Rptr. 301 (5th Dist.1983). Further, the cases that find the immunity inapplicable, such as *Morgan* and *Johnson* do not do so on the basis of a "special relationship," but because the negligence alleged is not merely the release of a violent prisoner.

Courts have routinely applied Section 846 immunity where police officers release someone who then goes on to harm a third party. *See, e.g., Santa Barbara v. Superior Court,* 15 Cal.App.3d 751, 93 Cal.Rptr. 406 (1971). The court has not found any cases, nor has the defendant cited any, in which § 846 immunity protected officers from liability for injuries to the released prisoner. The purpose of the statute is to prevent police from over-using their arrest power merely to avoid civil liability for harm that results from failure to arrest and detain. "[The power to make an arrest] is strictly limited and the abuse of such power can result in civil liability. It would be contrary to public policy, simultaneously to permit the imposition of civil liability for a failure to exercise the power. Hence the [§ 846] immunity is a logical adjunct to the public policy." *Lehto v. City of Oxnard,* 171 Cal.App.3d 285, 217 Cal.Rptr. 450 (2d District, 1985). The court concludes that the purpose of the statute is to provide immunity to the public entity or officer from liability for any

wrongdoing by a released prisoner that harms a third party. *See, e.g., Hernandez v. City of San Jose* 14 Cal.App.4th 129, 134, 17 Cal.Rptr.2d 589 (1993). ("Many recent cases which have considered what duty a police officers owes to members of the public have concluded the police have no duty to protect individuals from potential *wrongdoers.*" (emphasis added.)) Therefore, the court concludes that § 846 immunity does not apply in the circumstances presented.

More to the point, however, plaintiffs's wrongful death claim arises from conduct by the defendant other than the mere fact that they released him. Plaintiffs claims are based on false arrest and a subsequent duty to provide medical care to plaintiff, or in the least to assess his medical status, by virtue of the duty created by defendants' custodial relationship with decedent. These claims are not precluded by Government Code § 846, as the "... [l]egislature has not granted immunity from liability for every act or omission following after the exercise of discretion." *Elton v. County of Orange,* 3 Cal.App.3d 1053, 1057, 84 Cal. Rptr. 27 (1970) (quoting *Sava v. Fuller,* 249 Cal.App.2d 281, 284, 57 Cal.Rptr. 312 (1967)). Finally, of course, plaintiffs seek to impose liability for the circumstances under which the decedent was released, rather than the mere decision to release.

### iii. Government Code Section 855.6

■ Defendant contends that plaintiffs' Sixth Claim is barred by Government Code Section 855.6, which provides in relevant part:

"Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others."

While the immunity granted under this section is broad, it has been held that it does not extend to a situation where the defendant fails to provide medical care for a prisoner in obvious need of such care. *Lucas v. City of Long Beach,* 60 Cal. App.3d 341, 349, 131 Cal.Rptr. 470 (1976) Plaintiffs argue that it is a question of fact whether the government entity had actual or constructive knowledge of such a need for medical care. California law supports this conclusion. *See Zeilman v. County of Kern,* 168 Cal.App.3d 1174, 1184, 214 Cal. Rptr. 746 (1985).

### iv. Government Code Section 855.8(a)

■ Defendants contend that plaintiffs' Sixth Claim is barred by Government Code Section 855.6, which provides in relevant part:

"(a) Neither a public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or addiction or from failing to prescribe for mental illness or addiction."

Plaintiffs do not argue that § 855.8(a) does not apply, but contend that "even assuming that this court accepts defendants' argument on this point, it does not dispense with the entirety of plaintiff's sixth claim for relief." The court agrees. Section 855.8(a) granting immunity relates to mental illness. Mental illness includes "any condition for which a person may be detained, cared for, or treated in a mental institution." Gov.Code § 854.4.

This statutory immunity covers specific acts and omissions by public employees for failure to diagnose and failure to prescribe.

(See Van Alstyne, Cal. Government Tort Liability Practice (1980) § 4.48, p. 399.) Clearly, Government Code section 855.8, subdivision (a), would protect public entities from errors in judgment as to whether a patient was mentally ill and therefore should be confined, or whether the patient is not mentally ill and should not be confined. Here, however, the question deals with the failure to refer decedent for evaluation rather than a failure as a result of diagnosis or treatment.

Insofar as defendants are immune from "failing to diagnose" decedent, they still had a duty to act reasonably to protect him while he was in their custody. Plaintiffs have alleged facts that would suggest an alternate theory of liability. When decedent was arrested, he had a laceration on his foot, was covered in vomit, and had trouble walking. While in his holding cell, he allegedly had a seizure. (FAC at ¶¶ 35, 38–39.) Therefore, to the extent that plaintiffs are alleging that defendants failed to render medical attention to decedent and that decedent was in obvious need of medical care, their claim is not dismissed. Moreover, of course releasing the defendant under the conditions noted, raises further nonimmune questions of liability.

### D. Plaintiffs' Standing as Successor in Interest

At the time that they filed their complaint, plaintiffs had not yet filed the affidavit required by California Code of Civil Procedure § 377.32 to establish standing as decedent's successor in interest. On November 5, 2010, plaintiffs Jerry Lum and Dorothea Timmons filed a declaration with the court that complies with § 377.32, along with a copy of the decedent's death certificate. ECF No. 23. Defendant's motion to dismiss for lack of standing is therefore DENIED.

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss, ECF No. 20, is DENIED in part and GRANTED in part. The court ORDERS as follows:

[1] Defendants' Motion to Dismiss plaintiffs' first claim for relief is DENIED.

[2] Defendants' Motion to Dismiss plaintiffs' fifth claim for relief is DENIED as to the City, and GRANTED as to the individual arresting officers.

[3] Defendants' Motion to Dismiss plaintiff's sixth claim for relief is GRANTED insofar as plaintiff rely on defendants' failure to diagnose decedent's mental condition. The motion to dismiss is DENIED insofar as plaintiffs allege that decedent was in obvious need of medical attention, and defendants failed to render medical attention to him.

[4] Plaintiffs are GRANTED leave to amend their complaint.

[5] Defendant's motion to dismiss the first through fifth and seventh claim for relief for lack of standing is DENIED.

IT IS SO ORDERED.