Filed 1/31/25  Sheremetiev v. County of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| DANIELLE SHEREMETIEV, | B330694 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV44539) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Michael Shultz, Judge.  Reversed with directions.

Joyce Law, Brigid Joyce; Navob Law and Kaveh Navab for Plaintiff and Appellant Danielle Sheremetiev.

Peterson, Bradford, Burkwitz, Gregorio, Burkwitz & Su, Avi A. Burkwitz, Gil Y. Burkwitz; Pollak, Vida & Barer, Daniel P. Barer and Karen M. Stepanyan for Defendants and Respondents County of Los Angeles, Brianna Vallejo, Charles M. Cardenas, and Mbi Ningo Mbi.

Danielle Sheremetiev appeals from a judgment entered in favor of respondent County of Los Angeles (the County) and several individual respondents (Deputy Brianna Vallejo, physician Charles M. Cardenas, M.D., and nurse practitioner Mbi Ningo Mbi, P.A.) who worked at the County's Century Regional Detention Facility (CRDF) where Sheremetiev was in custody when she incurred the injuries at issue in the instant lawsuit. The trial court entered the judgment after granting respondents' motion for summary judgment of Sheremetiev's complaint. We agree with Sheremetiev that the court erred in granting the motion as to her claim against Vallejo for negligence. Accordingly, we reverse the judgment and direct the trial court to enter a new order granting summary adjudication in respondents' favor on the remaining four claims (for intentional infliction of emotional distress (IIED), medical malpractice negligence, failure to summon medical care under Government Code section 845.6, and violation of the Bane Act (Civ. Code, § 52.1)).

Sheremetiev also attempts to challenge the court's postjudgment order denying her motion to tax costs. Because she failed to file a notice of appeal of this separately appealable order, however, we cannot and do not address this argument.

### FACTS AND PROCEEDINGS BELOW

### A. Sheremetiev's Claim for Damages and Federal Complaint

On March 19, 2019, Sheremetiev filed and served a timely "claim for damages to person or property" with the County (the claim form). (Capitalization omitted.) The claim form described two incidents that Sheremetiev contended occurred while she was

2

detained at CRDF.  First, on September 23, 2018, Sheremetiev fell while walking quickly to the showers, fracturing the patella in her left knee.  Second, on February 13, 2019, Vallejo and another deputy ordered Sheremetiev to sleep in the top bunk of her bed, despite medical orders in Sheremetiev's file prohibiting this.  When Sheremetiev attempted to do so, she fell, injuring her head, neck and back.

The claim form cites these incidents as the basis for the following causes of action:  violations of the Eighth and Fourteenth Amendments to the United States Constitution, negligence, IIED, violation of the Bane Act, and other "federal and state claims."  (Capitalization omitted.)  The County denied relief in response to the claim form.

On August 7, 2019, Sheremetiev sued respondents in the United States District Court for the Central District (case No. CV 19-6852-JFW(MAAx)).  The federal court declined to assert supplemental jurisdiction over Sheremetiev's state law claims and dismissed those claims on October 23, 2020.

## B.    The Instant Complaint

On November 19, 2020, Sheremetiev filed the instant action, the operative complaint of which is the second amended complaint (SAC).  Based on allegations regarding the same two incidents described in the claim form, the SAC asserts causes of action (1) against the County and Vallejo under Government Code section 845.6 for failure to summon immediate medical care following each incident, (2) against Vallejo for negligence and IIED, (3) against Vallejo and the County for violation of the Bane Act, and (4) against Cardenas and Mbi (the CRDF physician and nurse practitioner who treated Sheremetiev while

3

she was in custody) and the County for medical malpractice negligence.

## C. Respondents' Motion for Summary Judgment

Respondents moved for summary judgment, or in the alternative, summary adjudication. Respondents supported their motion with, inter alia, the declaration of Dr. Paul Adler, a physician specializing in osteopathic medicine and "correctional medicine." Sheremetiev filed an opposition supported by her own declaration, a June 11, 2020 letter from orthopedic surgeon Dr. Daniel M. Silver regarding "personal injury [¶] initial comprehensive orthopedic consultation" and a June 15, 2020 letter from Silver titled "supplemental report—review of medical records" (collectively, Silver's letters), as well as the transcript of Silver's deposition in the federal action. (Capitalization & underscoring omitted.)

We summarize key portions of the evidence at issue presented on summary judgment below.

### 1. *Sheremetiev Declaration*

Sheremetiev declared the following in opposition to the summary judgment motion:

#### a. *2018 slip and fall*

After Sheremetiev slipped and fell on September 23, 2018, she was seen by CDRF medical staff, who also took X-rays and diagnosed her with a broken patella. She was transported to LAC+USC Medical Center the next day, where an orthopedic doctor diagnosed her with " 'a comminuted patellar fracture.' " She was ordered to urgently be seen at the CRDF outpatient orthopedic clinic within one week. Hospital medical personnel

put Sheremetiev's injured knee in "a splint or brace" and told her to avoid weight bearing activities.

A lock down at CRDF on October 3, 2018, however, prevented her consultation at the clinic on that date. Instead, respondent Mbi, a nurse practitioner at the clinic, consulted with Sheremetiev a week later. X-rays of Sheremetiev's knee reflected no changes. Mbi provided Sheremetiev with a knee immobilizer and instructed her to use crutches. Sheremetiev had "a few" additional consultations with Mbi before Sheremetiev was discharged from the orthopedic clinic around the end of November 2018, at which point her knee remained fractured.

Upon her return to CRDF, Sheremetiev was provided a wheelchair without leg extenders and was not allowed crutches. Her knee immobilizer broke and was not replaced for several weeks. CRDF medical personnel instead gave her an ace bandage.

Sheremetiev's injury caused her a great deal of pain, and she complained regularly to CRDF staff about both her pain and her broken immobilizer. In early 2019, Sheremetiev began telling medical staff that she believed she was having a "ligament issue" with her injured knee as well, and that she was concerned it did not appear to be healing. At no point did CRDF obtain an MRI of her knee or provide her with physical therapy.

b. *2019 fall from bunk bed*

Because of her knee injury, on February 11, 2019, "lower bunk orders were placed in the system on [Sheremetiev's] behalf," meaning she was not to be moved to a top bunk. Two days later, Vallejo and one other deputy "came to [Sheremetiev's] cell and ordered [her] to move to the top bunk by the end of the day. [Sheremetiev] showed them [her] visible knee brace and told

5

them [she] had a broken patella. [She] also told them [she] had medical orders in place that [she] could only use a bottom bunk." The two deputies then left, and returned "a short time later and again ordered [Sheremetiev] to move to the top bunk by the end of the day." "They stood outside [Sheremetiev's] cell in an intimidating manner and again aggressively yelled at [her] to move. [She] was afraid [she] would get in trouble or be moved to solitary confinement if [she] did not do what they said. [¶] . . . [L]ater that evening, per the deputies' orders, [she] tried to climb to the top bunk. There were no stairs or anything to help [her]," so she "used the desk to help [her] up" and fell, injuring her head, neck, and back.

Sheremetiev's cellmate was present when Sheremetiev fell. Sheremetiev "[is] informed and believe[s] and thereon allege[s] [her cellmate] rang the emergency button in the cell to summon help" but "[n]o one came to assist." Sheremetiev did not tell any CRDF personnel about the fall until the next day, after which CRDF personnel transported her to the main clinic. She "was given an ice pack and told [she] would be seeing a doctor," which the next day she did. Specifically, she saw Cardenas on February 15, 2019, at which time "X-rays were taken of [her] knee, spine and skull" and her "wounds were also treated." Sheremetiev told Cardenas during this visit about pain in her neck and back from the fall, as well as continuing pain in her left knee and asked "whether [it] could be a ligament issue." Cardenas told her "there was no change to [her] patella fracture per the X-ray and that he would refer her back to the ortho[pedic] clinic." (Capitalization omitted.) Sheremetiev continued to complain of pain in her neck, back and knee, orally and in writing, and was never referred to the orthopedic clinic.

Sheremetiev "was very depressed and felt helpless as to [her] ongoing medical issues and pain. [She] resigned [herself] to the fact nothing would heal while in jail."

c. *Treatment after Sheremetiev's release from CRDF*

In April 2019, after Sheremetiev was released, she consulted an orthopedic doctor, who advised her that her patella remained fractured. An MRI revealed Sheremetiev had a complex meniscus tear. The doctor referred her to physical therapy. When physical therapy failed to relieve her pain, Sheremetiev underwent knee surgery in November 2020. Despite the surgery, Sheremetiev's knee "has not been the same since [the] injury" and she "continue[s] to have pain" requiring her at times to use a knee brace.

Sheremetiev also consulted a doctor for "ongoing pain in [her] neck and back." The doctor ordered an MRI of her neck and referred her to physical therapy. Sheremetiev has received two "diagnostic numbing injections in [her] neck to try and relieve the pain," three steroid injections on her "lower right SI joint," and receives monthly "trigger point injections" in her neck, shoulders, and lower back. Despite these injections, she is "in constant pain" and takes daily pain medications. Medical personnel have advised her that she may need spinal surgery and/or further knee surgery to address her symptoms.

## 2. *Adler Declaration*

Declarant Adler is an osteopathic doctor whose practice specializes in "correctional medicine" which he defines as "treating and overseeing inmates in a detention facility setting." As a result, Adler is "thoroughly familiar with protocols for

treating inmates, including the relevant nuances in providing medical treatment in a jail setting and transferring inmates to other facilities" and the applicable standard of care for medical professionals. Adler reviewed the SAC, various of Sheremetiev's medical records; the video depicting Sheremetiev's 2018 slip and fall; and the depositions of Cardenas, Mbi, and Sheremetiev.

The only reference in the Adler declaration to any of the injuries Sheremetiev claims resulted from her fall from the bed, or to that incident generally, is as follows: "On February 15, 2019, . . . Sheremetiev claims that she fell and hit her head on the upper bunk inside the facility. She also claimed that her knee was re-injured."

The declaration contains Adler's "expert opinion . . . that the care and/or treatment provide[d] to . . . Sheremetiev at CRDF, including the care and treatment provided by . . . Cardenas and . . . Mbi, complied with the applicable standard of care for correctional health providers at all relevant times." He further declares that, "to a reasonable degree of medical probability, that nothing . . . Cardenas, . . . Mbi, or County medical personnel did, or allegedly failed to do, caused, or contributed to . . . Sheremetiev's alleged injury in this matter." Adler elaborates on this opinion as follows: "The medical records and/or imaging studies reflect that even after her release from jail, . . . Sheremetiev's patella fracture was healing without the need for surgical intervention. . . . Further, based on the imaging study following her release from jail,[1] none of the jail[']s conduct

---

[1] The imaging Sheremetiev obtained following her release from CRDF included imaging of both her neck and her knee. It is thus possible that—but not clear whether—Adler's reference

8

and/or alleged inaction resulted in any further injury to . . . Sheremetiev's patella or any other claimed injury."

Sheremetiev filed evidentiary objections to Adler's declaration, only one of which is relevant to the instant appeal. Namely, Sheremetiev objected to the majority of Adler's opinions regarding standard of care, and all of his opinions regarding causation, on the following basis: "Adler states he has his doctorate in osteopathic medicine. He is not an orthopedic doctor or surgeon. Thus, plaintiff contends he does not qualify as an expert under Evidence Code section 720. Improper expert opinion." (Capitalization omitted.)

### 3. *Silver Deposition Testimony and Silver's Letters*

Silver's letters summarize his "personal injury [¶] initial comprehensive orthopedic consultation" with Sheremetiev, informed by his review of certain medical records and a physical examination of Sheremetiev on June 11, 2020, as well as a supplemental review of additional medical records on June 15, 2020. (Capitalization & underscoring omitted.) Among the medical records Silver reviewed, and that Sheremetiev offered in opposing summary judgment, was a June 13, 2019 letter from Dr. Alexander Usmanov summarizing an MRI performed on Sheremetiev's cervical spine at Wilshire Downtown Advanced Imaging Radnet. It contains a finding of 3 mm herniations of the C3-C4, C4-C5, C5-C6, and C6-C7 vertebrae.

Silver's letters offer several "diagnoses," including a "[l]eft knee medial meniscus tear," "[c]ervical herniated nucleus

---

to post-custody imaging is referring only to Sheremetiev's knee injury.

9

pulposus at C3-C4, C4-C5, C5-C6, and C6-C7," as well as anxiety, depression and insomnia. (Capitalization & underscoring omitted.) The letters further recommend additional treatments for both the knee injury and spinal injuries, including physical therapy, epidural injections, and possibly surgery. As to "causation," Silver opines that the injuries to Sheremetiev's cervical spine and knee, as well as her anxiety, depression and insomnia "[are] the result of" the September 2018 slip and fall and the February 2019 fall from the bed.

In Silver's October 13, 2020 deposition in the federal case, he denied having formed or offered any opinions as to "whether the care that . . . Sheremetiev received in the jail was inappropriate, negligent, no good, [or] anything of that nature." Silver did, however, opine at his deposition as to the causes of some of Sheremetiev's claimed injuries. In his opinion, the damage to at least one of the disks in Sheremetiev's neck and the related pain were the result of her fall from the bunk bed,[2]

---

[2] Specifically, he testified that "[t]he fall off of the bunk on [February 15, 2019] seemed to precipitate her neck pain, and I would say it was probably that fall that caused at least one of the disks, possibly two of the disks to tear and herniate. [¶] . . . [¶] . . . I would speculate that she had some weakness of the disks to begin with, and then when she fell, either two of them or I think there was all of them had a 3 millimeter bulge, but it's hard to tell which ones were most injured [by the] fall." "Q. So once she fell off this bunk bed, in terms of an injury that you could tell being caused by the fall with respect to any imaging, are you able to tell one way or the other? [¶] . . . [¶] . . . [A.] . . . She describes hitting her head, and that would snap the neck when you hit your head, so something happened to the neck, and I couldn't tell you if it was one disk or four disks that were damaged."

10

and both of the falls caused and/or exacerbated her anxiety, depression, and insomnia.

Respondents filed evidentiary objections to Silver's letters on the basis that both were inadmissible hearsay because they were not "declaration[s] in conformity with . . . Code of Civil Procedure, [section] 2015.5" and that they lacked foundation.

### 4. *Order Granting Motion*

The court overruled Sheremetiev's objections to Adler's declaration, sustained respondents' objections to Silver's letters, and granted respondents' summary judgment motion. The court concluded that respondents "[had] met their burden of establishing no breach of duty and the lack of causation" in a manner that affected all causes of action, because "[Sheremetiev] [had] not submitted an expert's declaration to controvert Dr. Adler's opinion that [respondents] complied with the standard of care or that [respondents'] conduct did not cause [Sheremetiev's] injuries." (Capitalization omitted.) The court rejected Sheremetiev's attempts to rely on Silver's deposition because Silver "did not render an opinion about the applicable standard of care" and indeed "expressly testified that he was not providing any opinions on whether the care provided in the jail setting was appropriate or not true. . . . His expertise is limited to orthopedic medicine. . . . Without an expert on standard of care or causation," the court concluded the undisputed facts prevented Sheremetiev from establishing any of her claims. The court further concluded that Sheremetiev's claim for failure to provide medical care failed because the undisputed material facts were that she had, in fact, received medical care after both of her injuries—just not in the way or of the type she deems sufficient. The court rejected respondents' argument that Sheremetiev's

11

Bane Act claim was untimely, but concluded that it nevertheless failed, as did all of her claims, for lack of a triable question regarding causation.

The court entered judgment in respondents' favor on all claims, and Sheremetiev timely appealed.

### D.    Cost Motions

After Sheremetiev had appealed the judgment, the trial court denied her motion to strike/tax costs in a cost memorandum the County had filed seeking costs associated with defending against both the federal and state court actions.  Sheremetiev did not appeal the court's denial of her motion to strike/tax.

## DISCUSSION

On appeal, Sheremetiev makes several arguments challenging the court's summary judgment ruling.  Our review of a trial court's grant of summary judgment is de novo. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) We therefore independently analyze the evidence in the record, except that to which objections were properly sustained, under the same summary judgment legal framework applicable in the trial court.  Under that framework, the party moving for summary judgment bears the initial burden of making a prima facie showing that there is no triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; see Code Civ. Proc., § 437c, subd. (c).)  Only if that party makes such a showing does the burden shift to the opposing party to produce evidence to challenge the moving party's evidence.  (*Aguilar, supra*, at p. 850; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)  "We liberally construe the evidence in support of the party opposing summary judgment [citation], and assess

12

whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under applicable legal standards." (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1109 (*Loggins*).)

### A. Medical Malpractice Negligence Claim

Sheremetiev appears to challenge summary adjudication of her medical malpractice negligence claim as to all respondents against whom it was alleged: the County, Cardenas, and Mbi. The County is statutorily immune from direct liability to a prisoner for medical negligence, however. (See Gov. Code, § 845.6.) Thus, as a matter of law, Sheremetiev's medical malpractice negligence claim against the County fails. Sheremetiev does not present any argument to the contrary.

Cardenas and Mbi, by contrast, are not statutorily immune to a medical malpractice claim by a prisoner. (See Gov. Code, § 845.6 [permitting suit against "a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state . . . for injury proximately caused by malpractice"].) We thus address Sheremetiev's arguments regarding the medical malpractice negligence claim against these individual respondents only.

Sheremetiev argues that Adler's declaration cannot, as respondents contend, satisfy their initial burden on summary judgment as to this medical malpractice claim. In so arguing, she does not contend Adler's opinions regarding duty and breach—namely, that Cardenas's and Mbi's treatment of Sheremetiev complied with applicable professional standard

13

of care—are improper or otherwise inadmissible expert opinion.[3] Rather, she argues the declaration fails to "address crucial pieces of information" in reaching these opinions and is wrong in light of that additional information. But the adequacy and correctness of otherwise admissible expert opinion is a matter for expert witnesses to debate and the trier of fact to consider—it is not a basis for excluding the expert opinion.

Sheremetiev further argues that, even if Adler's declaration is admissible, she offered opposition evidence sufficient to create a triable question of fact on the standard of care. We disagree. Establishing the standard of care to support a medical malpractice claim requires admissible expert opinion on that subject, which neither Silver's letters nor Silver's deposition provide. (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410.) This is because, at his deposition, Silver stated he was not offering any opinion on standard of care, and the court acted within its discretion in excluding Silver's letters for lack of a penalty of perjury attestation as required under Code of Civil Procedure section 2015.5.

Sheremetiev urges that we ignore Code of Civil Procedure section 2015.5 in the name of liberally construing evidence in favor of the plaintiff, as we must in reviewing an order granting a defendant's motion for summary judgment. But none of the

---

[3] As we discuss, *ante* at part C.4, Sheremetiev *does* argue that Adler did not opine on whether *Vallejo* breached a duty of care to Sheremetiev, because his declaration does not address the duty of care a nonmedical prison official like Vallejo owes a prisoner. This argument is inapplicable to Adler's opinions regarding the medical standard of care for the treatment Cardenas and Mbi provided.

14

cases Sheremetiev cites applies the rule of liberal construction to justify a plaintiff relying on evidence that does not satisfy statutory admissibility requirements. (See *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 189; *Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607–608.) Rather, *Hanson* addresses whether an expert declaration contained causation and standard of care opinions that were sufficiently specific and definite to avoid summary judgment. (*Hanson, supra*, at pp. 607–608.) The court concluded that "[a]lthough the style of the [expert] declaration is at times a bit obtuse, [the plaintiff] [was] entitled to all favorable inferences that may reasonably be derived from that declaration," and that the declaration was sufficiently specific to support the inference that nerve damage the plaintiff had "suffered during surgery was caused by the conduct of defendants, which conduct fell below the applicable standard of care. Nothing more was needed." (*Ibid*.) And *Garrett* addresses admissibility of an expert declaration under Evidence Code section 802 and *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771, which "allows the trial court to inquire into the reasons for an expert's opinion and to exclude expert opinion testimony if it is 'based on reasons unsupported by the material on which the expert relies.' " (*Garrett, supra*, at p. 186.) The court concluded that, "[i]n light of the rule of liberal construction, [the] reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial" in order to satisfy Evidence Code section 802 and *Sargon*. (*Garrett, supra*, at p. 189.) For this reason, "the trial court could not properly

15

exclude the expert testimony based on [the expert's] failure to identify the particular tests employed or describe the test results." (*Ibid.*) *Garrett* thus speaks to how a trial court should differently calibrate, at various procedural stages, the level of detail an expert must provide to establish a sufficient factual basis for his opinions. It does not suggest a court can or should ignore a statutory requirement that a declaration be executed under penalty of perjury in order to constitute admissible testimony.

### B. Failure to Summon Medical Care Claim

As noted, Government Code section 845.6 prohibits a claim against the County for medical malpractice based on the quality of medical care it provides a prisoner. But the statute also expressly permits a prisoner to sue both the County and its employees if a County employee "knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." The section "is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employee's malpractice in providing that care." (*Castaneda v. Department of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1070 (*Casteneda*).) Accordingly, a Government Code section 845.6 failure to summon claim cannot be based on the quality or type of care summoned and provided. (*Castaneda, supra,* at p. 1072.) For example, "the failure to prescribe necessary medication or, once summoned to provide treatment, to ensure proper diagnosis, or to monitor the progress of an inmate that the public employee has been summoned to assist, are issues relating to the manner in which medical care is

16

provided, and do not subject the state to liability under [Government Code] section 845.6 for failure to summon." (*Castaneda*, *supra*, at p. 1074, capitalization & italics omitted; *Nelson v. State of California* (1982) 139 Cal.App.3d 72, 80–81 (*Nelson*); *Watson v. State of California* (1993) 21 Cal.App.4th 836, 841–843 (*Watson*).)

The record contains undisputed evidence that, after both her slip and fall and her fall from the bed, the County summoned and provided Sheremetiev with medical care. Sheremetiev disputes this with respect to the fall from the bed, pointing to statements in her declaration that her cellmate pressed the emergency button after Sheremetiev fell, but no one responded. This statement is not competent evidence, however, as Sheremetiev declares it only "on information and belief," not based on her own personal knowledge. (See *Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1124; see *ibid.* ["[d]eclarations based on information and belief are insufficient to satisfy the burden of either the moving or opposing party on a motion for summary judgment or adjudication"].) The competent evidence before the court, by contrast, universally reflects that Sheremetiev first informed CRDF personnel about her fall from the bed the following day, and that she was seen by medical staff at that point.

Sheremetiev further argues that, even if the County summoned medical care for her immediately after her two falls, there are triable issues as to (1) whether the County summoned medical care on *other* occasions when she complained regarding the injuries resulting from these falls, and (2) whether the County summoned medical care in the manner prescribed by the medical personnel who initially examined her. Neither

17

type of conduct is a basis for a Government Code section 845.6 failure to summon claim.  As to the first type, Sheremetiev more specifically points to evidence that:  she repeatedly complained of pain in her knee, but no assistance was provided to her; she told jail staff she suspected she had a ligament issue in her knee, but was never sent for additional diagnostics to assess this; and she complained of pain in her back and neck, but was never seen by an orthopedic specialist to address these complaints.  However, "[l]iability under [Government Code] section 845.6 is limited to [a failure to summon care for] serious and obvious medical conditions requiring immediate care." (*Watson, supra,* 21 Cal.App.4th at p. 841; accord, *Lawson v. Superior Court* (2010) 180 Cal.App.4th 1372, 1385.)  Pain associated with injuries the County personnel had previously assessed and treated is not such a "serious and obvious medical condition[ ] requiring immediate care." (*Watson, supra,* at p. 841.)  Nor does Sheremetiev reporting her lay suspicion that she had additional issues beyond those identified through her previous treatment constitute such an obvious need for medical care.  Whether or not these responses to Sheremetiev's complaints may provide a basis for liability against the County employees under a different legal theory—and we neither conclude that nor consider whether they do—any such liability would not be based on Government Code section 845.6.

As to the second type of conduct Sheremetiev characterizes as a failure to summon medical care, Sheremetiev points to evidence that:  after CRDF medical personnel urgently referred her to the orthopedic clinic after her slip and fall, she was not seen at the clinic until 16 days later; medical personnel instructed Sheremetiev to hold her leg in a straight position,

but CRDF did not provide her with a leg extender or crutches; and her knee immobilizer was not replaced when broken. But these issues all speak to the quality of care that was received—not whether care was summoned. "[T]he failure of . . . public employees [after summoning medical care for a prisoner in immediate need] to provide further treatment, or to ensure further diagnosis or treatment, or to monitor . . . or follow up on [a prisoner's] progress, are all facts which go to the reasonableness of the medical care provided, but do not constitute a failure to summon medical care." (*Casteneda, supra*, 212 Cal.App.4th at p. 1072, italics omitted; *Watson, supra*, 21 Cal.App.4th at pp. 841–843; *Nelson, supra*, 139 Cal.App.3d at pp. 80–81.) Nor does delay in providing treatment for which a prisoner is referred a failure to summon. (*Castaneda, supra*, at pp. 1072–1073.)

Thus, Sheremetiev has failed to identify conduct that could constitute failure to summon medical care in a manner actionable under Government Code section 845.6. The trial court did not err in ruling on this cause of action.

### C. Causes of Action Based on Sheremetiev's Fall From the Bed

Three of Sheremetiev's causes of action are based on her 2019 fall from the bed and injuries to her neck, back, and emotional well-being. These are: her negligence claim against Vallejo, her IIED claim against Vallejo, and her Bane Act claim against the County and Vallejo (collectively, the bed fall claims). For reasons we discuss below, we conclude the court erred in granting respondents' motion as to one of these claims.

19

### 1. *Silver's Deposition Testimony Creates a Triable Question of Fact as to the Cause of Sheremetiev's Claimed Neck and Back Injuries*

Sheremetiev contends that, even if the opinions in the Adler declaration satisfied the respondents' initial burden as to the cause of her neck and back injuries, Silver's letters contain contrary opinions on causation, and because the court abused its discretion in excluding Silver's letters, they create a triable question of fact. We need not determine whether Adler's declaration contains admissible causation opinions regarding the cause of the neck and back injuries, because even assuming it does, and even though the court properly excluded Silver's letters (see Discussion *ante*, part A), Silver's *deposition* creates a triable question as to the cause of these injuries, as respondents correctly conceded at the hearing before this court.[4] In his deposition, Silver disclaimed opinions on the standard of care, but offered opinions as to the cause of Sheremetiev's back and neck injuries. Respondents did not object to Silver's deposition testimony, and the court did not exclude it. Accordingly, respondents failed to show there was no triable issue as to

---

[4] Below respondents argued there was no triable issue of causation on the additional basis that Sheremetiev's own conduct, rather than Vallejo's actions, caused Sheremetiev to fall from the bed and get injured. But given Sheremetiev's uncontradicted declaration that she only attempted to climb to the top bunk because she felt she had to do so after receiving Vallejo's order, a triable issue of fact exists as to the proximate cause of the injury she incurred in the process.

whether Sheremetiev's falling while attempting to get into the top bunk caused some or all of her claimed injuries.[5]

We next consider whether respondents have identified any other bases on which the bed fall claims necessarily fail. We address each claim in turn below.

## 2. *IIED Claim*

For conduct to support an IIED claim, it must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community," and the defendant must have engaged therein with the intention of causing, or with reckless disregard of the probability of causing, emotional distress. (See *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903 [outlining elements of an IIED claim].) Respondents urge that we may affirm the court's ruling on the IIED claim based on the lack of a triable question regarding several of these elements, not just the causation element the trial court cited. We conclude there was no triable question as to the intent

_____

[5] To support another argument that Silver's deposition testimony cannot create a triable issue as to the *standard of care and breach* elements of Sheremetiev's claims, respondents note that certain of Silver's deposition testimony uses the words "speculate" and "possible." To the extent respondents also argue that Silver's deposition testimony cannot create a triable issue *as to causation* for this same reason, we disagree. Taken as a whole, and given the liberal manner in which we are to construe plaintiff's evidence (see *Loggins*, *supra*, 151 Cal.App.4th at p. 1109), Silver's deposition testimony includes an opinion that Sheremetiev's fall from the bunk bed caused the damage to at least one of the four damaged disks in her cervical spine, even though Silver could not say whether it was more than one. (See fn. 2, *ante*, containing the specific deposition language.)

element of Sheremetiev's IIED claim, and thus need not reach respondents' other arguments.

The conduct Sheremetiev describes in her testimony as the basis for her IIED claim is that Vallejo, in a threatening manner, ordered Sheremetiev to use the top bunk despite knowing about the medical orders in Sheremetiev's file prohibited Vallejo from doing so. Sheremetiev argues this conduct could be deemed sufficiently extreme and outrageous to support her IIED claim because it reflects Vallejo " ' " 'abus[ing] a relation or position which [gave] [Vallejo] power to damage [Sheremetiev's] interests.' " ' " (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1122.) But even if Vallejo's conduct is as Sheremetiev testified, and even assuming it is sufficiently extreme and outrageous, there is nothing in the record to create a triable question as to whether Vallejo *intended* such conduct to cause Sheremetiev extreme emotional distress, or that Vallejo acted with reckless disregard for whether it would. Sheremetiev testified that she did not feel Vallejo was "out to get [her]"—that is, that she did not feel Vallejo wanted to harm her. There is no evidence in the record to the contrary. Thus, the evidence is uncontradicted that, whatever Vallejo's motivation, Vallejo was not acting with an intent to harm Sheremetiev—let alone with the intent to cause Vallejo " ' " 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.)

Thus, we affirm the court's ruling as to the IIED claim on this alternative basis that respondents established there was no triable question as to whether Vallejo acted with the requisite intent to cause Sheremetiev severe emotional distress.

22

### 3. *Bane Act Claim*

Respondents argue the motion was properly granted as to the Bane Act claim on several bases, only some of which the trial court relied upon. We find one of these arguments the trial court relied on dispositive and thus need not address whether the other bases would also be sufficient to justify summary adjudication of this claim.

Under the Bane Act, "[i]f a person or persons, whether or not acting under color of law, interferes . . . or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of" the individual's constitutional or statutory rights, that individual "may institute and prosecute in [his or her] own name and on [his or her] own behalf a civil action for damages." (Civ. Code, § 52.1, subds. (b) & (c).) The act thus authorizes a private right of action where, inter alia, a defendant " 'tried to or did . . . force the plaintiff to do something that he or she was not required to do under the law' " by means of " 'threat, intimidation, or coercion.' " (*King v. State of California* (2015) 242 Cal.App.4th 265, 294.)

Sheremetiev characterizes her Bane Act claim as based on Vallejo and another deputy forcing Sheremetiev "by verbal [*sic*] threats and physical intimidation" to try and climb up to the top bunk, thereby "interfer[ing] with her right to protection from bodily harm" guaranteed by, inter alia, Civil Code section 43. In her declaration, Sheremetiev described these threats and intimidation as Vallejo and another deputy "[standing] outside [Sheremetiev's] cell in an intimidating manner and . . . aggressively yell[ing] at [her] to move," which caused Sheremetiev to feel "afraid [she] would get in trouble or be moved to solitary confinement if [she] did not do what they

23

said." At her deposition, Sheremetiev similarly described Vallejo and the other deputy as pressuring her to use the top bunk with words, not physical efforts, and did not testify that either deputy expressly or impliedly threatened to physically harm her if she did not comply with their commands. She also affirmatively testified she was not concerned that either Vallejo or the other deputy was going to physically harm her.[6]

Respondents point to this testimony and argue that, as a matter of law, it prevents Sheremetiev from maintaining a cognizable Bane Act claim. We agree. The Bane Act provides that "[s]peech alone is not sufficient to support an action . . . except upon a showing that the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence had the apparent ability to carry out the threat." (Civ. Code, § 52.1, subd. (k); see *Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 959 ["the multiple references to violence or threats of violence in the statute serve to establish the unmistakable tenor of the conduct that [Civil Code] section 52.1 is meant to address"].) Here, Sheremetiev testified that she was not afraid Vallejo would become physically violent with her. Rather, Sheremetiev feared that, if she refused to comply, she

---

[6] Specifically, she testified: "Q. When you had seen [Vallejo] before, was she someone who you were concerned about like this is someone who might do some harm to me? Was that a feeling you had? [¶] A. No, no. I mean, you know, any deputy—I—never mind. I won't say that, but, you know, I did not think she was out to get me."

would get in "trouble" and possibly be placed in solitary confinement—neither of which constitutes physical violence. Sheremetiev identifies no contrary evidence. Accordingly, respondents met their burden of establishing, using Sheremetiev's testimony, that she cannot maintain a triable Bane Act claim to the jury.

### 4. *Negligence Bed Fall Claim*

Although the portion of the court's ruling specifically addressing the negligence bed fall claim focused solely on the issue of causation, the court noted elsewhere in its order that "Adler's opinion that [respondents] complied with the standard of care . . . undercuts all of [Sheremetiev's] claims." Sheremetiev argues that the Adler declaration does not speak to the standard of care applicable to her bed fall negligence claim against Vallejo and thus could not assist respondents in meeting their burden regarding this claim in the manner the court noted. We agree.

Sheremetiev's negligence claim against Vallejo is based on the "special relationship between jailer and prisoner, [which] impos[es] on the former a duty of care to the latter," specifically a duty "to protect them from foreseeable harm." (*Giraldo v. Department of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231, 250 & 252; see *id.* at p. 252 [duty covers actions of " 'prison official[s]' " specifically].) Adler did not address such a duty. Adler declared he was a medical doctor with expertise in "correctional medicine" and spoke to the professional standard of care applicable to medical personnel in the correctional setting and medical professionals generally. Sheremetiev does not even allege Vallejo provided Sheremetiev with any medical care. Thus, the opinions Adler provided do not

25

address the duty at issue in Sheremetiev's negligence claim against Vallejo.[7]

### D.     Order Denying Motion to Tax Costs

Sheremetiev further challenges the court's denial of her motion to tax costs.  "A postjudgment order awarding or denying costs is a separately appealable order."  (*Kajima Engineering and Construction, Inc. v. Pacific Bell* (2002) 103 Cal.App.4th 1397, 1402; Code Civ. Proc., § 904.1, subd. (a) & (a)(2) ["[a]n appeal, other than in a limited civil case, may be taken from . . . [¶] . . . [¶] . . . an order made after a judgment made appealable by paragraph (1)"].)  Sheremetiev did not appeal from the postjudgment order denying her motion to tax costs; nor can we liberally construe her appeal from the judgment as encompassing this order, as the order did not yet exist at the time Sheremetiev filed her appeal.  "Consequently, we are without jurisdiction to review [the order regarding costs]."  (*Kajima Engineering and Construction, supra*, at p. 1402.)

---

[7] Although the briefing is not entirely clear on this point, respondents appear to be arguing that Sheremetiev failed to preserve any argument that Adler was unqualified to opine on the duty of care Vallejo owed Sheremetiev, and/or whether Vallejo breached that duty, because Sheremetiev did not object to the Adler declaration on this specific basis.  But because the Adler declaration does not include opinions covering the duty a nonmedical prison official owes a prisoner, there was nothing in the Adler declaration Sheremetiev could have objected to in this regard.

## DISPOSITION

The judgment and order granting respondents' motion for summary judgment are reversed. Following remand, the court shall enter a new order granting respondents' motion to the extent it seeks summary adjudication of the first, third, fourth, and fifth causes of action (for failure to summon medical care, IIED, violation of the Bane Act, and medical malpractice negligence), but denying the motion to the extent it seeks summary adjudication of the second cause of action for negligence.

The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

WEINGART, J.

M. KIM, J.

27